NEW ENGLAND LAND COMPANY, LTD. *v.* WILLIAM DeMARKEY, JR., ET AL.
(13763)

PETERS, C. J., HEALEY, GLASS, COVELLO and HULL, Js.

Argued November 8, 1989—decision released February 6, 1990

*Harvey J. Rothberg,* for the appellant (named defendant).

*Stefan R. Underhill,* with whom, on the brief, was *John Crosskey,* for the appellee (plaintiff).

GLASS, J. This is an appeal by the named defendant,[1] William DeMarkey, Jr., from the denial of his motion to dissolve or vacate an ex parte prejudgment real estate attachment obtained by the plaintiff, New England Land Company, Ltd. (NELCO), in conjunction with a claim for a real estate commission. We find error and remand the case for further proceedings.

The trial court, *Fuller, J.,* found that the evidence offered by NELCO at the hearing on DeMarkey's motion was "basically uncontested." NELCO is a real estate brokerage company with an office in Greenwich. One of its employees is George N. Bagley, a licensed Connecticut real estate broker. On September 22, 1986, the defendants, William DeMarkey, Jr., and Connecticut Bank and Trust Company (CBT), were owners of real property located at 177 West Putnam Avenue in Greenwich. NELCO, acting through Bagley as its agent, on September 22, 1986, procured a written agreement[2] with DeMarkey and CBT that gave

---

[1] The Connecticut Bank and Trust Company is also a defendant in this lawsuit, but is not a party to this appeal.

[2] The agreement reads as follows:

"EXCLUSIVE LISTING AGREEMENT

AGREEMENT made this 22nd day of September, 1986, between,
Mr. William DeMarkey, Jr. and CBT, Trustee U/W. L. DeMarkey
101 Stanwich Road                    240 Greenwich Avenue
Greenwich, CT 06830 .                Greenwich, CT 06830
hereinafter called OWNER, and NEW ENGLAND LAND COMPANY, LTD., its principal office at 135 East Putnam Avenue, Greenwich, Connecticut, 06830, hereinafter called AGENT.
WITNESSETH, that the parties hereto have agreed as follows:
1. OWNER hereby gives NEW ENGLAND LAND COMPANY, LTD., sole AGENT for and gives to it the exclusive right to lease/sublease the whole or any part of, and/or sell the property known as
177 West Putnam Avenue
Greenwich, CT 06830

NELCO the exclusive right to sell the Greenwich property and the exclusive right to sublease all or part of it. The agreement extended from September 22, 1986, to "March 23, 1987 and thereafter, until terminated by either party giving to the other 30 days prior notice

2. OWNER agrees, during the life of this agreement, to refer to AGENT all offers and inquiries with respect to said property. AGENT agrees to diligently investigate and develop such offers and inquiries and to canvass, solicit and otherwise employ its services to bring about a leasing or sale of said property. All leases and contracts of sale are to be approved and executed by the OWNER.

3. OWNER agrees to pay AGENT, and AGENT agrees to accept as full compensation for its services in connection with such leasing or sale, a commission to be computed upon the rental involved or the gross sale price as the case may be, as provided by Exhibit 'A' attached hereto.

In the event that any such leasing or sale shall be effected by a broker not in the employ of AGENT, OWNER agrees to pay AGENT as full compensation therefore, an amount equal to a commission and one-half as outlined above in Paragraph 3 out of which AGENT shall pay such broker their commission.

4. AGENT is authorized, to advertise the property, prepare and secure signs, plans, circulate material, and other forms of advertising.

AGENT is authorized to erect and have cause to be maintained a 'For Rent' and/or 'For Sale' sign on the property.

5. This agreement shall become effective as of September 22, 1986 and continue in full force and effect until March 23, 1987 and thereafter, until terminated by either party giving to the other 30 days prior notice in writing; but upon and after the effective date of termination, OWNER [shall] be obligated to recognize AGENT as procuring broker in any negotiations then pending or begun prior thereto, and shall pay to the AGENT upon the consummation thereof, compensation as provided in paragraph 3 hereof.

6. Any controversy or claim arising out of, or relating to this agreement, or for the breach thereof, shall be settled by arbitration before the American Arbitration Association.

7. This agreement contains the entire understanding of the parties and it may not be changed, rescinded or modified orally but only by written instrument duly signed by the parties hereto.

8. This agreement shall be binding upon the heirs, executors, administrators, successors and assigns of the respective parties hereto.

9. Commissions are payable at the time the sale is closed as provided in Appendix A. No commission is due unless and until title passes.

10. This agreement is subject to Public Accommodations Act, Section 46s-64 of the Connecticut General Statutes."

in writing." In the agreement, the defendants agreed to pay NELCO a commission based on the rental price or gross sales price as provided in a schedule attached to the agreement and designated in the agreement as Appendix A.[3] The agreement provided for a sales commission of 6 percent of the property's sale price. If the property were sold or leased by a broker not employed by NELCO, however, the defendants agreed to pay a commission to NELCO of one and one-half times the commission stated in Appendix A.

In addition, on March 5, 1987, NELCO and the defendants signed a modification[4] to the September 22, 1986 agreement, extending it to September 30, 1987,

---

[3] Appendix A attached to this agreement reads as follows:
"APPENDIX A — LISTING AGREEMENT DATED
September 22, 1986 FOR 177 WEST PUTNAM AVENUE.
SCHEDULE A
COMMISSION SCHEDULES
SALES

LEASES

BUSINESS LEASES
The commission for leasing business property shall be:

| | |
|---|---|
| First 5 years' gross rent | 5% |
| Years 6 through 10 gross rent | 2.5% |
| Years 11 through 20 gross rent | 2% |
| thereafter | 1% |

IMPROVED PROPERTY
The commission for the sale or exchange of all improved property, residential, industrial, and commercial shall be:

| | |
|---|---|
| On the sale price: | 6% |

Provided that the lease negotiated through the broker contains specific language granting the lessee rights to acquire an equity interest in the leased property, and the unearned portion of the lease commission is offset against the sale commission.

Otherwise, the commission to the broker on a sale of the leased property to the lessee when combined with the lease commission paid will not exceed $120,000. or fraction thereof for a partial sale."

[4] The modification reads as follows:
"MODIFICATION TO SEPTEMBER 22, 1986 EXCLUSIVE LISTING AGREEMENT

Paragraph #5 contained within the executed exclusive listing agreement (9/22/86) shall be modified so as to extend the exclusive listing period until

and specifically stating that all other provisions of the agreement remained unaltered and in full effect. On March 23, 1988, a letter,[5] signed by an agent of NELCO and by DeMarkey, referenced the prior agreement and provided for a $30,000 payment to NELCO for providing two tenants for the building on the property. The letter specifically stated that it was intended "to confirm that except as modified hereby our original Exclusive Listing Agreement is still in full force and effect." CBT, however, did not sign this letter. Futhermore, no written notice was given that the termination date of the original agreement, March 23, 1987, had passed, and that the termination date of the modification agreement, September 30, 1987, had also passed.

On April 6, 1988, NELCO entered into a co-brokerage agreement regarding the property with two licensed

September 30, 1987. All other provisions contained within paragraph #5 and throughout the remainder of the agreement including Schedule A and Notes on Leasing Commissions are to remain unaltered and in full effect.

[5] The text of the March 23, 1988 letter reads as follows:

"This letter is intended to set forth our mutual understanding with respect to a modification of the above-referenced Exclusive Listing Agreement for the sale and leasing of your building 177 West Putnam Avenue, Greenwich, Connecticut.

In this regard, we hereby agree that you shall pay us and we shall be deemed to have earned (as of the date hereof) $30,000 120 days from today. This payment is to compensate us for providing you with two ready, willing and able Tenants at your building (Rehoboth Party Delight, Ltd. and Greenwich News, Inc.) and your not executing, in a timely manner, the leases pertaining to same. However, if you do execute and deliver both of these Leases within this time frame then we shall not be paid this $30,000 but shall be paid the normal applicable commission under our original Listing Agreement. This $30,000 payment shall also be made to us if either or both of these leases are not finalized due to a sale of the building.

The letter is also to confirm that except as modified hereby our original Exclusive Listing Agreement is still in full force and effect.

If the foregoing is agreeable to you, please so indicate by signing in the space provided below.

Accepted and Agreed"

Connecticut real estate brokers, Marjorie Rowe and Benjamin Rowe. The defendants also received from the Rowes an offer to buy the property. The next day, April 7, 1988, the Rowes agreed to purchase the property from the defendants for $1,800,000, and during the summer of 1988, the defendants sold the property to the Rowes for that price. The defendants refused, however, to pay NELCO any sales commission. In addition, DeMarkey also failed to pay the $30,000 provided in the agreement between himself and NELCO in the letter dated March 23, 1988.

NELCO then commenced this action against the defendants. NELCO's complaint was in two counts. The first count sought recovery of the sales commission ($162,000)[6] and the second count sought recovery of the $30,000 that NELCO claimed DeMarkey owed it as a result of their letter agreement. NELCO obtained a prejudgment remedy for $192,000 against DeMarkey's interest in property that he owned in Greenwich. DeMarkey moved to discharge the prejudgment real estate attachment, claiming that there were several defenses to NELCO's commission claim, most of them based on alleged noncompliance with the real estate listing statute, § 20-325a[7] of the General Stat-

---

[6] The trial court arrived at the figure of $162,000 by taking 9 percent of the sale price, $1,800,000.

[7] "[General Statutes] Sec. 20-325a. ACTIONS TO RECOVER COMMISSIONS ARISING OUT OF REAL ESTATE TRANSACTIONS. (a) No person who is not licensed under the provisions of this chapter, and who was not so licensed at the time he performed the acts or rendered the services for which recovery is sought, shall commence or bring any action in any court of this state, after October 1, 1971, to recover any commission, compensation or other payment in respect of any act done or service rendered by him, the doing or rendering of which is prohibited under the provisions of this chapter except by persons duly licensed under this chapter.

"(b) No person, licensed under the provisions of this chapter, shall commence or bring any action in respect of any acts or services rendered after October 1, 1971, as set forth in subsection (a), unless such acts or services were rendered pursuant to a contract or authorization from the per-

utes. The court, *Fuller, J.,* however, denied the motion. DeMarkey appealed to the Appellate Court and pursuant to Practice Book § 4023, we transferred the case to this court.

On appeal, DeMarkey claims that the court, *Fuller, J.,* erred: (1) in finding probable cause that a listing complies with General Statutes § 20-325a, despite its failure to include a notice of negotiability mandated by General Statutes § 20-325b;[8] (2) in utilizing the provisions of a termination clause in a listing, which violates General Statutes § 20-320 (6),[9] to extend the duration

son for whom such acts were done or services rendered. To satisfy the requirements of this subsection any such contract or authorization shall (1) be in writing, (2) contain the names and addresses of all the parties thereto, (3) show the date on which such contract was entered into or such authorization given, (4) contain the conditions of such contract or authorization and (5) be signed by the owner or an agent authorized to act on behalf of the owner only by a written document executed in the manner provided for conveyances in section 47-5, and by the real estate broker or his authorized agent.

"(c) The provisions of this section shall not apply to any person excepted from the provisions of this chapter by section 20-329 with respect to any acts performed by him which are included in such exception."

[8] "[General Statutes] Sec. 20-325b. CERTAIN REAL ESTATE AGREEMENTS TO CONTAIN NOTICE REGARDING COMMISSIONS. REQUIREMENTS. Each written agreement which fixes the compensation to be paid to a real estate broker for the sale of real property shall contain the following statement in not less than ten point boldface type or in a manner which otherwise stands out significantly from the text immediately preceding any provision of such agreement relating to compensation of the broker:

"NOTICE: THE AMOUNT OR RATE OF REAL ESTATE COMMISSIONS IS NOT FIXED BY LAW. THEY ARE SET BY EACH BROKER INDIVIDUALLY AND MAY BE NEGOTIABLE BETWEEN THE SELLER AND BROKER."

[9] "[General Statutes] Sec. 20-320. SUSPENSION OR REVOCATION OF LICENSE. FINES. The department of consumer protection may, upon the request of the commission or upon the verified complaint in writing of any person, provided such complaint, or such complaint together with evidence, documentary or otherwise, presented in connection therewith, shall make out a prima facie case, investigate the actions of any real estate broker or real estate salesman, or any person who assumes to act in either of such capacities within this state. The commission shall have the power temporarily to suspend or permanently to revoke any license issued under the pro-

of the listing to encompass the services performed by the broker for which it seeks to collect a commission; (3) in finding probable cause that a listing failing to state the listed price of the property was enforceable; and (4) in concluding that there is probable cause to recover a real estate commission under the second count to the complaint because the listing agreement fails to contain the notice of negotiability mandated by General Statutes § 20-325b and, does not include a leasing price.

I

Because DeMarkey has appealed, pursuant to General Statutes § 52-278*l*, from an adverse ruling on his motion to dissolve or vacate a prejudgment remedy order, we first must determine the scope of our review.[10] "We have recently examined the trial court's function in considering an application for prejudgment remedy of attachment: 'The language of our prejudgment remedy statutes; General Statutes § 52-278a et

visions of this chapter and, in addition to or in lieu of such suspension or revocation, may, in its discretion, impose a fine of not more than one thousand dollars for the first offense at any time when, after proceedings as provided in section 20-321, it finds that the licensee has by false or fraudulent misrepresentation obtained a license, or that the licensee is guilty of any of the following . . . (6) entering into an exclusive listing contract which contains a fixed termination date if such contract also provides for an automatic continuation of the period of such listing beyond such date.

[10] General Statutes § 52-278*l* provides in pertinent part: "APPEAL. (a) An order (1) granting or denying a prejudgment remedy following a hearing under section 52-278d or (2) granting or denying a motion to dissolve or modify a prejudgment remedy under section 52-278e or (3) granting or denying a motion to preserve an existing prejudgment remedy under section 52-278g shall be deemed a final judgment for purposes of appeal." Furthermore, § 52-278e of the General Statutes requires, where an ex parte prejudgment real estate attachment has been issued, that notice of the right to move to dissolve be provided. In this case, DeMarkey moved to dissolve and a hearing was held at which he appeared and was heard. Thus, this appeal presents no constitutional problem. See *Augeri* v. *C. F. Wooding Co.*, 173 Conn. 426, 428, 378 A.2d 538 (1977).

seq.; requires that the court determine "whether or not there is probable cause to sustain the validity of the plaintiff's claim"; General Statutes § 52-278d (a); that is to say "probable cause that judgment will be rendered in the matter in favor of the plaintiff." General Statutes § 52-278c (a) (2). "The legal idea of probable cause is a *bona fide* belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." *Wall* v. *Toomey,* 52 Conn. 35, 36 (1884). Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false. *Texas* v. *Brown,* 460 U.S. 730, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983). The hearing in probable cause for the issuance of a prejudgment remedy is not contemplated to be a full scale trial on the merits of the plaintiff's claim. The plaintiff does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim. *Ledgebrook Condominium Assn., Inc.* v. *Lusk Corporation,* 172 Conn. 577, 584, 376 A.2d 60 (1977). The court's role in such a hearing is to determine probable success by weighing probabilities. *Michael Papa Associates* v. *Julian,* 178 Conn. 446, 447, 423 A.2d 105 (1979).' *Three S. Development Co.* v. *Santore,* 193 Conn. 174, 175–76, 474 A.2d 795 (1984); see also *Babiarz* v. *Hartford Special, Inc.,* 2 Conn. App. 388, 393, 480 A.2d 561 (1984)." *Solomon* v. *Aberman,* 196 Conn. 359, 362–63, 493 A.2d 193 (1985).

As for our standard of review, we have stated: "This court's role on review of the granting of a prejudgment remedy is very circumscribed." *Three S. Development Co.* v. *Santore,* supra, 176. In its determination of probable cause, "the trial court is vested with broad discretion which is not to be overruled in the absence of clear error. *Augeri* v. *C. F. Wooding Co.,* 173 Conn.

426, 429, 378 A.2d 538 (1977)." Id. "Since *Augeri* v. *C. F. Wooding Co.,* supra, we have consistently enunciated our standard of review in these matters. ' "In the absence of clear error, this court should not overrule the thoughtful decision of the trial court, which has had an opportunity to assess the legal issues which may be raised and to weigh the credibility of at least some of the witnesses." ' *Three S. Development Co.* v. *Santore,* supra; *William M. Raveis & Associates, Inc.* v. *Kimball,* [186 Conn. 329, 333, 441 A.2d 200 (1982)]; *Babiarz* v. *Hartford Special, Inc.,* supra, 392–94; see also *Michael Papa Associates* v. *Julian,* supra, 447. At this time, therefore, we need only decide whether the trial court's conclusions were reasonable under the 'clear error' standard." *Solomon* v. *Aberman,* supra, 364. Accordingly, we conclude that our standard of review is to determine if the trial court's denial of DeMarkey's motion constituted clear error.

## II

The gravamen of DeMarkey's claims is that "the Listing under which [NELCO] seeks to collect a commission fails to include two essential conditions: the statutory notice of negotiability mandated by . . . § 20-325b and, a listing price." We will consider these claims in the reverse order stated.

## A

Under General Statutes § 20-325a (b) a real estate broker cannot bring an action for a real estate commission unless his "acts or services were rendered pursuant to a contract or authorization from the person for whom such acts were done or services rendered. To satisfy the requirements of this subsection any such contract or authorization shall . . . (4) contain the conditions of such contract or authorization . . . . " In *Storm Associates, Inc.* v. *Baumgold,* 186 Conn. 237, 244, 440 A.2d 302 (1982), we considered the require-

ments of a listing contract under § 20-325a (b) (4) in conjunction with our discussion of the requirements of a sales contract, and we stated: "Its [General Statutes § 20-325a (b) (4)] commandment that the written listing contract contain 'the conditions of such contract or authorization' refers to the conditions of the listing contract and not to those of the sales contract. For the listing contract, it suffices to identify the property being offered for sale and *the price at which it is to be listed.* See *Brazo* v. *Real Estate Commission,* [177 Conn. 515, 522, 418 A.2d 883 (1979)]." (Emphasis added.)

In this case, the trial court, *Fuller, J.,* expressly found that the listing agreement did not contain the price at which the property was to be offered for sale. The trial court, however, did not view the absence of a stated price in the listing as invalidating the listing agreement pursuant to § 20-325a (b) (4). Rather, the trial court concluded that, even though the listing agreement did not contain a specific price for a sale or lease of the property, the agreement could "arguably be construed as meaning any price at which the owner agrees to sell or lease the property, i.e., at a price subject to the owner's approval, as opposed to a price set in advance." The trial court failed to point to any language in the listing agreement that permits such a construction. In support of its construction, however, the trial court cited *Sticklor* v. *Woodland House Condominium, Inc.,* 9 Conn. App. 293, 518 A.2d 949 (1986), cert. denied, 202 Conn. 807, 520 A.2d 1288 (1987).

In *Sticklor,* the Appellate Court held enforceable a listing agreement that failed to include the sale price of the property. In so doing, the Appellate Court concluded that, under the particular facts of that case, § 20-325a (b) (4) did not require that the price be included under the listing agreement Id., 294. We express no opinion concerning the holding in *Sticklor,* but note that the facts of the instant case distinguish

it from *Sticklor*. In *Sticklor*, the "property was a 237 unit condominium complex and the broker's primary obligation was to find potential buyers for the seller rather than to sell the units himself." Id., 297. From these facts, the Appellate Court concluded that it was apparent that the seller "was reserving to itself the right to determine which unit it was willing to sell and the price it would accept for any given unit." Id. This case is devoid of any facts indicating any reservation to the seller to determine the sale price of the property. We therefore adhere to our construction of § 20-325a (b) (4), as set forth in *Storm Associates, Inc.* v. *Baumgold*, supra, that the listing contract must identify a particular price at which the property is offered for sale, or at least provide a formula by which the price may be determined.

Furthermore, although the granting or denial of a prejudgment remedy involves ordinarily a factual determination, in this action, that factual determination in turn furnishes the predicate for the determination of the legal issue, i.e., whether the listing agreement complies with § 20-325a (b). Whether a particular listing agreement complies with § 20-325a (b) is a question of law. Moreover, our attention has not been directed to any statutory or case law requiring the legal defense asserted in this case to be postponed for consideration until trial. We are persuaded, therefore, that, where the pleadings and exhibits are the only evidentiary concerns, the dictates of judicial economy instruct us to resolve the legal validity of a particular agreement, under an applicable statute at the earliest time practicable. Accordingly, since the trial court made a finding of fact that the listing agreement did not contain a price for the sale of the defendants' property, we conclude that the listing agreement as a matter of law fails to comply with the requirements of § 20-325a (b) (4) of the General Statutes. See *Storm Associates, Inc.* v. *Baumgold*, supra.

Because the listing agreement in this case is unenforceable, it was clear error for the trial court to deny DeMarkey's motion to dissolve or vacate the prejudgment remedy placed against his property in Greenwich.

B

Returning to the first claim of DeMarkey, that the listing agreement failed to include the essential condition of the statutory notice of negotiability mandated by § 20-325b of the General Statutes, the trial court found that "[t]he listing here and any extension of it did not meet this [§ 20-325b] requirement." The trial court in its memorandum of decision referred to two Superior Court cases[11] concerning the negotiability issue but, the court refused nonetheless to hold that as a matter of law a listing agreement that failed to comply with § 20-325b precluded granting a prejudg-

---

[11] The Superior Court cases the trial court referred to are *Currie* v. *Marano,* Superior Court, judicial district of Waterbury, Docket No. 072774 (November 13, 1986) (J. Healey, J.), *rev'd on other grounds,* 13 Conn. App. 527, 537 A.2d 1036, cert. denied, 207 Conn. 809, 541 A.2d 1238 (1988), and *T. R. Preston Co.* v. *Pasay,* Superior Court, judicial district of Windham, Docket No. CV 840028111S (January 23, 1985) (Noren, J.). The trial court stated: "While the Superior Court decisions referred to indicate that noncompliance with the notice requirement in [General Statutes] § 20-325b precludes an action to recover a broker's commission under [General Statutes] § 20-325a (b) and it may be a valid defense at a trial on the merits, in the absence of a higher court decision this court cannot decide that it is a sufficiently clear legal defense to deny the [plaintiff] a [prejudgment remedy]. It is also recognized that there are numerous cases holding that the listing agreement must strictly comply with § 20-325a (b) in order for a real estate broker to recover a commission. See *Rostenberg-Doern Co.* v. *Weiner,* 17 Conn. App. 294, 305 [552 A.2d 827 (1989)]; *Revere Real Estate, Inc.* v. *Cerato,* 186 Conn. 74, 77 [438 A.2d 1202 (1982)]; *Thornton Real Estate, Inc.* v. *Lobdell,* 184 Conn. 228, 229, 230 [489 A.2d 946 (1981)]; *Hossan* v. *Hudiakoff,* 178 Conn. 381, 383 [423 A.2d 108 (1979)]; *Jay Realty, Inc.* v. *Ahearn Development Corporation,* [189 Conn. 52, 55, 453 A.2d 771 (1983)]; *Howland* v. *Schweir,* [7 Conn. App. 709, 714–15, 510 A.2d 215 (1986)]; *Arruda Realty, Inc.* v. *Doyon,* 35 Conn. Supp. 617, 620 [401 A.2d 625 (1978)]. None of these cases hold[s] that noncompliance with other broker statutes [is] to be read into § 20-325a."

ment remedy based on the agreement. Because of our disposition of the issue regarding the listing agreement's failure to contain the property's sale price as required by § 20-325a (b) (4), it is unnecessary for us to decide DeMarkey's negotiability claim. For the same reason, it is not necessary for us to determine the validity of the listing agreement's automatic extension provision.

Finally, the $30,000 indebtedness alleged in count two of the complaint cannot support a prejudgment remedy since this debt is based on the modification of the listing agreement that we have concluded will not justify the granting of a prejudgment remedy.

There is error in denying DeMarkey's motion to dissolve or vacate the prejudgment real estate attachment and the case is remanded for further proceedings in accordance with this opinion.

In this opinion PETERS, C. J., HEALEY and HULL, Js., concurred.

COVELLO, J., dissenting. I dissent.