[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
In this case, the defendants have moved for summary judgment. The plaintiff filed suit because of the alleged failure of the defendant to pay a brokerage commission for the sale of an inn located in Groton. The defendants argue that they are entitled to summary judgment because §20-325a of the General Statutes bars the claim. Subsection (b)(7) mandates that there be a written contract and authorization signed by the parties for whom the brokerage services were performed or by an authorized agent of such parties. It is claimed that here (b)(7) was not complied with. Also it is argued that the plaintiff/broker failed to substantially comply with subsections (b)(2), (3) and (6) which require that the listing agreement provide the name of the person or persons for whom it is alleged the brokerage services were provided, the date of contract or authorization and a statement of the broker's lien rights pursuant to § 20-325 (a)(d). The defendants also move for summary judgment on the claim of unjust enrichment since § 20-325 (a) and failure to comply with it cannot be overcome by an unjust enrichment claim.
The standards to be applied on summary judgment motions are clear. If there is a genuine issue of material fact, the court cannot decide it since litigants have a constitutional right to a trial before the trier of the fact. On the other hand, if no genuine issue of material fact bars the granting of the motion, it should be granted since people should not be forced to continue to defend against meritless claims.
 I
The court will first deal with the claim that (b)(7) of the statute was not complied with.
Section 20-325a(b) sets forth certain requirements that must be met or found before an action for a commission can be brought by a real estate broker. There are seven subsections. It is true that subsection c of § 20-325a states that nothing in the statute shall prevent recovery of a commission for any services rendered "if the broker has substantially complied with subdivisions (2) to (6) inclusive, of subsection (b) . . . and it would be inequitable to deny such recovery." But this subsection was passed in 1994 and does not address subdivision CT Page 6867 (I) (contract or authorization commission to be in writing) and subdivision (7) (the contract of authorization must be signed by the person for whom the services are to be rendered).
Thus, as to the requirements of subdivisions (1) and (7) of subsection (b) of the statute, the language of pre-1994 cases applies which held that: "It is well established that the requirements of § 20-325 a(b) are mandatory rather than permissive and that the statute is to be strictly construed." New England Co. v. DeMarkey, 213 Conn. 612, 623
(1990); also see Rapin v. Nettleton, 50 Conn. App. 640 at pp. 646-648 (1998).
"The right of a brokerage firm to recover a commission depends upon the terms of its employment contract with the seller. To be enforceable, this employment contract, often called a listing contract, must be in writing and must contain the information enumerated in General Statutes §20-325a(b)." Revere Real Estate v. Cerato, 186 Conn. 74, 77 (1982). It has also been held that "whether a listing agreement complies with these requirements is a question of law." M.R. Wacob Co. v. MBM Partnership,232 Conn. 645, 656 (1995); New England Co. Ltd. v. DeMarkey,213 Conn. at p. 623.
There is no dispute here that the listing agreement was not signed by the defendants for whom the plaintiff alleges he performed brokerage services. The plaintiff concedes as much in his affidavit when he states the owner of the property, the defendant Carbee "failed or neglected to sign the Open Listing Agreement . . ." As noted in CMG Realty ofConnecticut Inc. v. Colonade One Ltd. Partnership, 36 Conn. App. 653, 658
(1995): "The statutory scheme of § 20-325a requires that a party who sues for a real estate commission must first show that the written contract or authorization under which the claim is made satisfies thefacial requirements of the statute as to names, addresses, date, conditions and signatures." (Emphasis by court.) Given the listing agreement's failure to comply with the (b)(7) requirements, it would seem that the plaintiff should be statutorily barred from receiving a commission. It is clearly an important ameliorative statutory requirement that the person receiving brokerage services sign the listing agreement. This goes to the heart of focusing the consumer of the services on the amount of the commission that will have to be paid in light of the agreed upon sales price. It is thus quite obvious why, in 1994, the legislature did not relax the facially mandatory requirement of (b)(7) of the statute as it did with several other of the subdivisions. If the owner does not sign the listing agreement how could it possibly be said that he or she understands the terms and conditions under which a commission would have to be paid. CT Page 6868
The plaintiff makes several arguments in response to the apparent logic of the defendants' motion. At page 8 of his brief he argues that "the court should deny defendants' motion because of the fact that the transaction in the instant case involves commercial property." Language in M.R. Wachob Co. v. MBM Partnership, supra, is cited which states §20-325a(b) was "targeted primarily at the sales of single family homes, and was designed to ensure that a homeowner who hired a broker to sell his or her home would understand the terms and conditions under which the owner would be obligated to pay the broker a commission. . . . Indeed, the bill was aimed primarily at private residential transactions because the kind of sophisticated people who are dealing with commercial and in commercial properties would not need that kind of protection." 232 Conn. at p. 259 (quotation is from legislative history). However, this case does not stand for the proposition that § 20-325a(b) does not apply to transactions involving noncommercial property. The court uses the language "primarily," not "exclusively". This statutory provision has, in fact, been applied to commercial real estate sales. See Boline v. Albert,23 Conn. App. 688, 689 (1991), which involved the sale of a commercial marina, also see New England Land Co. Ltd. v. DeMarkey, supra, which involved the sale and lease of commercial property, 213 Conn. at page 616, footnote 5. Nothing in the statute itself nor in the entire chapter governing "Real Estate Brokers and Salespersons" confines its applicability to the activities of real estate brokers involved in sale or rental of residential properties. It would be an odd result if the statute were so interpreted in any event. Commercial sellers of property cannot always be defined as corporate titans with large and sophisticated in-house legal staff some indeed are small businesses run by people relatively unsophisticated especially about the real estate market. The language of § 20-325a(b) contains no limiting language and the court believes it should apply to residential and commercial transactions.
Two further arguments are made to apparently counter the seemingly otherwise obvious applicability of the requirement of subdivision (b)(7) of the statute. First it seems to be argued that "viewing in a light must favorable to the plaintiff there is little doubt the parties had an agreement." Mr. Taylor submitted an affidavit indicating he presented the open listing agreement to the defendant Crabtree. He goes on to say Crabtree had given him a tremendous amount of information, he met with the man numerous times relating to the sale of the inn, he showed the property to prospective purchasers on several occasions and each time Crabtree was there, he told him the names of prospective purchasers who had contacted him. He presented two purchasers to Crabtree and Crabtree negotiated a reduction in his commission. Numerous documents and letters to verify the above assertions are attached to the plaintiff's objection to the motion for summary judgment. There are several communications from Taylor to Crabtree inquiring whether certain prospective buyers had CT Page 6869 contacted Crabtree. It is certainly true that if this were a case that turned on the question of whether there was a contract or agreement between these parties under traditional contract law, then the court would find there was a contract and the plaintiff would prevail on its objection to this motion.
 "When the parties manifest their agreement by words the contract is said to be express. When it is manifested by conduct it is said to be implied in fact. If A telephones a plumber to come to A's house to fix a broken pipe, it may be inferred that A has agreed to pay the plumber a reasonable fee for the plumber's services although nothing is said of this. The contract is partly express and partly implied in fact. There are cases of contracts wholly implied in fact. The distinction between this kind of contract and a contract expressed in words is unimportant: both are true contracts formed by a mutual manifestation of assent."
Law of Contracts, 4th Ed., Calamari Perillo, § 1.11, p. 21.
But this case does not turn on the question of whether there was a valid agreement under ordinary principles of contract law. This case turns on whether a statute, which the legislature had the unquestioned authority to pass, has been complied with. In effect, the legislature has declared as a matter of public policy that brokerage agreements such as this shall not be enforceable unless the requirements of § 20-325a(b) and its subdivisions, here particularly § (b)(7), are complied with. In other words, the legislature has said apart from the requirements in the law established to determine whether there has been contract formation, agreements for brokerage commissions will not be enforced in the courts unless, for example, the owner of property signs the listing agreement.
The defendant also relies on a line of cases all of which stand for the proposition that: "It is not necessary that the listing agreement be contained in a single document. For separate documents to constitute a valid contract under the statute (referring to § 20-325a(b)), however, the documents must collectively satisfy the requirements of the statute and relate to the same listing agreement," New England InvestmentProperties, Inc. v. Spire Realty Development Corp., 31 Conn. App. 682,685 (1993), also see Jay Realty, Inc. v. Ahearn Development Corp.,189 Conn. 52, 55 (1983); Boline v. Albert, 23 Conn. App. 688, 691 (1991). Most of these cases rely on a decision by Judge Parskey in Good v. PaineFurniture Co., 35 Conn. Sup. 24 (1978). That case is instructive on the CT Page 6870 problem now before the court. There, the plaintiff conceded the nonexistence of a written agreement complying entirely with §20-325a(b). However, he introduced a series of documents which he contended met the statutory requirement. Two documents appear to be letters signed by the plaintiff setting forth the terms of the agreement as to the brokerage commission, a letter by the lessee who was allegedly procured by the plaintiff acknowledging the plaintiff "as the exclusive broker in the procurement of Burger King as a lessee" and "a letter dated June 27, 1977, in which the defendant's attorney, acting as its agent, requests Burger King to agree to the modification or deletion of certain terms and provisions included in the lease," id. p. 26. The court on the following page sets forth the general principal, later followed in the case law, that "separate documents which not only relate to the same brokerage agreement but which also collectively meet the specific requirements of § 20-325a(b) will be deemed to constitute a valid contract or authorization for purposes of § 20-325a(b)." In Good,
like here, the central concern of the court appears to have been the failure of the defendant or its agent to sign the listing agreement or documents equivalent to it. Thus, the court only concentrates on the June 27th letter signed by the defendant's agent and states:
 "The letter dated June 27, 1977, although signed by an agent of the defendant, is not related on its face, to the brokerage agreement between the plaintiff and the defendant. Parol testimony presented at the hearing on the defendant's motion failed to show convincingly that the June 27 document was related in any way but a tangential manner to the brokerage agreement. The court therefore finds the plaintiff has failed to produce a contract or authorization valid under § 20-325a(b)," id. p. 27.
Here, even if the documents attached to the plaintiff's objection to the motion can be characterized as referring to the brokerage agreement as such, viewed separately or all together, they do not satisfy the requirement of (b)(7) that there be a signed acknowledgment of the listing agreement by the parties, including an owner like the defendant. Unlike Good, there is not even a document presented signed by the defendants or their agent. And as in Good, documents signed by the plaintiff referring to the brokerage agreement are not relevant on the issue of failure to sign off on the agreement by the defendants.
Because of failure to comply with subsection (b)(7) of § 20-325a, the motion for summary judgment should be granted.[1]
 II
CT Page 6871
The defendant also argues that the plaintiff failed to comply with § 20-325a(b)(2), (3) and(6).
In (b)(2), it is stated that the listing agreement must contain the name of the person for whom the services were rendered; (b)(3) requires the agreement to list the date on which it was entered into; and (b)(6) requires the agreement inform the owner of the broker's right to place a lien on the property under certain conditions.
As previously noted in 1994, as to subdivisions (b)(2) through (b)(6), the broker's claim will not be defeated if there is substantial
compliance with these requirements. The concept of "substantial compliance" is not defined in the statutory subsection which sets forth the concept, see § 20-325a(c). The defendant has referred to a Superior Court case that addresses this issue. Dow Condon v. Muros N.Ltd. Partnership, (J.D. Hartford, CV99-0587440, 1999). The court there seems to take the position that the test to determine if there has been substantial compliance is to first determine the status of compliance with each of the other requirements set forth in (b)(2) through (b)(6) besides the failure to comply with the particular requirement that is before the court. If there has been such compliance, then one can look at the particular omission and see if some of the protections sought to be provided by the act were satisfied even with regard to the claimed omission. In Dow Condon, the plaintiff broker conceded he did not sign the modified listing agreement as required by (b)(5) but did orally communicate his assent to the defendant. The court held in light of compliance with the other subdivisions, (b)(2), (3), (4) and (6) and the oral communication, the question of substantial compliance presented a genuine issue of material fact, which it would not take from the trier of fact.
Here, there is nothing facially in the agreement indicating compliance with (b)(2), name of broker, (3) date on which agreement entered into, or (6) notice of lien rights. As to (b)(2), there are numerous letters from the plaintiff to the defendant Carbee about prospective purchasers and Mr. Taylor does state he delivered the listing agreement to Mr. Crabtree. The court would find substantial compliance with (b)(2) — the name of the broker was certainly known to Mr. Carbee. As to (b)(3), the plaintiff's affidavit only states he presented the listing agreement to Crabtree "on or about" May 6, 1998. None of the other documents submitted by the plaintiff refer to the exact date the agreement was entered into so it can be said that there has been no compliance substantial or otherwise with (b)(3). But it is true that on May 14, 1998, Taylor did send to in Carbee the name of a prospective purchaser according to documents submitted by the plaintiff. That puts the date of the agreement CT Page 6872 in the same time framework. Concerning (b)(6), there is nothing in the agreement concerning lien rights and no other document submitted to the court indicates that the defendants were informed of this subsequent to the listing agreement so that there has been no compliance of any sort with (b)(6).
There is compliance with (b)(4) in that the listing agreement does contain the conditions of the contract, suggested sales price, subject to modification by parties, and percentage commission. The agreement is also signed by Mr. Taylor, the plaintiff broker, so that (b)(5) is complied with. Can it be said that under these circumstances the question of substantial compliance presents a genuine issue of material fact for summary judgment purposes?
The problem here is that as to notice of lien rights there is no mention of it in the agreement or in any other document or any claim it was told to the defendant by oral communication. The way this court reads subsection (c), there has to be some form of compliance with each of the (b)(2) through (b)(7) requirements. Even in Dow Condon, the court, having found compliance with all the other relevant subdivisions of subsection (b), felt obligated to find at least oral compliance with (b)(5) as a prerequisite to its holding that it could not find lack of substantial compliance as a matter of law.
The motion for summary judgment is also granted on this ground also.
 III
The plaintiff argues that the defendant is estopped from denying the plaintiff his commission. The plaintiff's position appears to be summed up on pages 11-12 of his brief: "Equitable estoppel applies as plaintiff relied in good faith on defendant's actions. Defendant's actions indicated an agreement. Defendant's actions indicated plaintiff would receive a commission if plaintiff brokered the sale of defendant's commercial property . . . The defendant forwarded a `tremendous' amount of information to the plaintiff. Plaintiff marketed the property. In defendant's presence, plaintiff showed the property to prospective purchasers. At one point, the defendant negotiated a reduced commission for plaintiff." The cases cited by the defendant indicate, however, that the arguments made by the plaintiff cannot prevail if the ameliorative and prophylactic purposes of the statute are to be accomplished. As stated in Currie v. Mariano, 13 Conn. App. 527, 531 (1988), to permit an equitable estoppel or unjust enrichment argument by a broker in a case where there has been noncompliance with the statute "would nullify §20-325a and emasculate the state's real estate licensing system." See also Goldblatt Assoc. v. Panza, 24 Conn. App. 250, 253 (1991); RealCT Page 6873Estate Auctions, Inc. v. Senie, 28 Conn. App. 563, 567 (1992); NewEngland Investment Properties v. Spire Realty Dev. Corp,31 Conn. App. 682, 687 (1993).
Dealing directly with the equitable estoppel claim made by the broker in Currie v. Mariano, supra, the court at p. 531 said:
 "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse."
The court went on to reject the broker's equitable estoppel claim at pp. 531-532 and said:
 "This plaintiff, a licensed real estate broker since 1958, should have been aware of the strict legal prerequisites to obtaining a broker's commission in a real estate sale as set forth in the laws governing such transactions. We cannot apply the doctrine of equitable estoppel in a case in which the party requesting the relief claims ignorance of the laws governing his profession, when such ignorance of the law is the primary cause of his need for such relief. Thus, we conclude that equitable estoppel does not apply in the present case.
The court in the leading case of Good v. Paine Furniture Co., supra, also rejected a quantum meruit argument made by the broker and at35 Conn. Sup., p. 28, quoted from Dooley v. Lachut, 103 R.I. 21, 24-25, where the Rhode Island Supreme Court said in a case where the broker failed to secure a written contract:
 "Real estate brokers who have been duly licensed by the state . . . are expected, when they are engaged in their business endeavors, to conform to the various laws which pertain to their occupation. Real estate brokers who enter into oral agreements in contravention of . . . our statute of frauds can expect no assistance from the courts in their effort to extricate themselves from their own folly. If a real estate broker fails to obtain a written contract of employment from his customer, he proceeds at his CT Page 6874 own peril."
The case of Rapin v. Nettleton, 50 Conn. App. 640 (1998), though cited by the plaintiff is of no help to his position and, in fact, agrees with the reasoning of cases like Currie v. Mariano and cases like New EnglandInvestment, supra, which hold that equitable estoppel and/or unjust enrichment arguments in a case like this would emasculate § 20-325a(b) and its intended purposes. That was not true of the situation in Rapin
and the court explained why at page 650:
 "In the present case, unlike in Currie and New England Investment, the plaintiff's ignorance of the laws governing his profession is not the cause for his need for relief. The plaintiff obtained what he believed to be a valid extension of the listing agreement that was signed by the defendant. The plaintiff was unaware that it was actually the defendant's husband that signed the extension agreement on behalf of and with the consent of the defendant. The plaintiff relied thereon to his detriment. Furthermore, permitting the plaintiff to prevail on an equitable estoppel theory in the present case would not emasculate this state's real estate licensing system, because the plaintiff believed that he was operating within the requirements of the law and the defendant and her husband allowed the plaintiff to so believe. As a result, the plaintiff's claim in the present case is factually distinguishable from cases that have precluded real estate brokers from invoking the doctrine of equitable estoppel."
Here, the listing agreement was not signed by the defendants or their agents and the listing agreement did not contain the following, the name of the persons for whom the services were to be performed (b)(2), a date (b)(3) and notice to the defendants of the broker's lien rights (b)(6). The plaintiff presented the Open Listing Agreement to the defendant Carbee so he must be held to be aware of its contents, what it included and what it did not include, and he knew Carbee failed or neglected to sign the agreement (see Taylor affidavit). Thus, the plaintiff Taylor cannot be said, like the broker in Rapin, to have no reason to be aware of the fact that he was not operating within the requirements of the law. The plaintiff's unfortunate plight is rather due to his failure to know the laws governing his profession or more likely his knowledge of them but failure to comply with them or see to it that they were complied with. CT Page 6875
The defendants' motion for summary judgment is granted.
Corradino, J.