## OSWALD G. RAPIN *v.* CYNTHIA NETTLETON
(AC 16989)

Lavery, Landau and Daly, Js.

Argued April 1—officially released October 6, 1998

*Marni Smith Katz,* with whom, on the brief, was *Bernard Green,* for the appellant-appellee (defendant).

*William C. Franklin,* for the appellee-appellant (plaintiff).

### Opinion

DALY, J. This is an appeal from the trial court's judgment for the plaintiff to recover a real estate commission. The defendant claims that the trial court improperly (1) disregarded the findings, conclusions and recommendations of the attorney trial referee, (2) ignored the provision of General Statutes § 20-325a (b) (7) requiring the owner's signature, (3) found a ratification by the defendant of her husband's conduct, (4) determined that the terms of the listing agreement extension were complied with and (5) failed to accept the report of the attorney trial referee to which the plaintiff had failed to file an objection. The plaintiff cross appeals claiming that the trial court failed to

award him prejudgment interest pursuant to General Statutes § 37-3a.

The attorney trial referee made fifty-nine findings of fact, which are not in dispute and may be summarized as follows. On February 25, 1992, the defendant entered into a written "Exclusive Right to Sell Listing" with the plaintiff, a real estate broker, with respect to the sale of the defendant's house at 208 Tuttle Road in Woodbury, at a price of $1,740,000, for a term of six months. Pursuant to that agreement, the defendant agreed to pay the plaintiff a commission of 6 percent if, during the term of the listing agreement, the property was sold or anyone found a buyer willing and able to buy the property at a price acceptable to the defendant or anyone obtained a binding enforceable agreement between the defendant and a buyer.

The defendant acquired the property jointly with her husband. Sometime after the purchase, the defendant's husband conveyed his interest in the property to the defendant for no consideration. The defendant relied on her husband, an experienced real estate developer, in the negotiation, listing and sale of the property. The defendant's husband negotiated the terms of the listing agreement directly with the plaintiff. The defendant's husband freely used the equity in the property for his business purposes, including three separate mortgages to American Bank. During the term of the listing agreement, the plaintiff listed the property in the multiple listing service, advertised it and showed it to several prospective purchasers. There were, however, no offers to purchase the property accepted by the defendant during the original listing period.

Shortly before the expiration of the listing period, the defendant's husband told the plaintiff that the defendant would extend the listing agreement. The defendant's husband told the plaintiff to send the extension

agreement to them for signature and also that they might reduce the asking price. The defendant's husband received the change authorization, filled in the listing price to reflect a reduction from $1,740,000 to $1,470,000, signed his wife's name to the listing agreement and mailed it back to the plaintiff. When he signed the defendant's name on the change authorization, the defendant's husband had her oral authorization to act on her behalf. The defendant agreed to extend the listing with the plaintiff and believed that her husband had effectively extended the listing by signing her name on the change authorization. The plaintiff, however, believed that the defendant had signed the change authorization. The change authorization extended the listing agreement until midnight, February 24, 1993. During the effective period of the change authorization, neither the defendant nor her husband attempted to repudiate the authority of the plaintiff to act as a broker on the defendant's behalf.

In December, 1992, American Bank was foreclosing on one or more of the mortgages on the defendant's property. That same month, the defendant's husband called Arminda Murtha, who had previously expressed an interest in the property, to say that his wife would sell the property for $850,000. A contract was prepared in late December, 1992, that called for a closing on January 29, 1993, with occupancy to be given to Murtha on March 1, 1993. That contract was never signed by Murtha or the defendant. In early January, 1993, a second contract was prepared, which was identical to the first contract in all respects except that it called for a closing on March 1, 1993. Murtha signed the second contract on January 9, 1993, and sent a deposit check for $10,000. When the plaintiff heard about the possible sale to Murtha, he talked with the defendant's husband and reminded him that the plaintiff would be owed a commission if the property was sold to Murtha. The

defendant's husband told the plaintiff that a sale at $850,000 would not be sufficient to pay the plaintiff a commission. Both parties agreed that they would need to talk about this issue further. On January 12, 1993, the plaintiff sent a letter to the defendant confirming that her husband had informed the plaintiff that the defendant was about to finalize a contract with Murtha. The letter also stated that he would "like to be assured that [his] commission will be taken into consideration, as per our listing agreement. Obviously, I would be willing to negotiate the amount of the commission." The plaintiff did not speak to the defendant or her husband after mailing the letter.

The defendant would have signed the contract with Murtha in the middle of January, 1993, except for the receipt of the plaintiff's demand for a commission, which the defendant and her husband did not want to pay. They did not attempt to negotiate with the plaintiff to reduce his commission. In February, 1993, the defendant's attorney returned the $10,000 deposit check to Murtha's attorney. The plaintiff believed that the sale to Murtha had not taken place and that the property was still on the market. He continued his efforts to sell the property.

On March 1, 1993, the defendant sold the property to Murtha for $850,000, although the price shown on the conveyance tax forms was $1,050,000. Until the day of the closing, Murtha was unaware that the $10,000 deposit had been returned to her attorney. At the closing on March 1, Murtha signed a new contract that was identical to the original contract that she had signed on January 9, 1993, except that the "Balance at Closing" was increased from $840,000 to $850,000 to reflect the $10,000 deposit that had been returned to her attorney.

On February 23, 1993, the plaintiff received a facsimile from another real estate agent indicating that he had

a client who had agreed in principle to purchase the property for $1,025,000. Immediately upon receipt, the plaintiff sent by facsimile the "offer" to the defendant's husband. The plaintiff attempted to telephone the defendant's husband about the facsimile, but did not receive a reply. The defendant never became aware of the "offer." To pay all of the closing expenses and to obtain releases of three mortgages to American Bank, the defendant and her husband provided additional funds at the closing in the amount of $11,088.15. On or about April 15, 1993, the plaintiff made demand on the defendant for payment of his commission of 6 percent of the purchase price of $850,000.

The attorney trial referee found that the change authorization extending the term of the listing agreement was not signed by the defendant pursuant to § 20-325a (b) (7).[1] Although the referee found that it would be inequitable to deny the plaintiff recovery and that the defendant acted in bad faith in raising as a

---

[1] General Statutes § 20-325a (b) provides in relevant part: "No person, licensed under the provisions of this chapter, shall commence or bring any action in respect of any acts done or services rendered . . . pursuant to a contract or authorization . . . . To satisfy the requirements of this subsection any contract or authorization shall . . . (7) be signed by the person or persons for whom the acts were done or services rendered or by an agent authorized to act on behalf of such person or persons, pursuant to a written document executed in the manner provided for conveyances in section 47-5, except, if the acts to be done or services rendered involve a listing contract for the sale of land containing any building or structure occupied or intended to be occupied by no more than four families, be signed by the owner of the real estate or by an agent authorized to act on behalf of such owner pursuant to a written document executed in the manner provided for conveyances in section 47-5."

We note that the attorney trial referee inadvertently applied the current version of § 20-325a (b) instead of the one in effect in 1992 and 1993, when the events at issue occurred. The language now contained in subdivision (7) of subsection (b) was in subdivision (5) prior to 1993 and, while the exact language differs from the current text, its operative effect remains unchanged. See General Statutes (Rev. to 1993) § 20-325a (b), as amended by Public Acts 1993, No. 93-355, and Public Acts 1994, No. 94-240, and subsequent revisions.

defense the statutory signature requirement of § 20-325a (b) (7), the attorney trial referee determined that the listing had not been signed by the owner for the purposes of § 20-325a and recommended judgment for the defendant unless the court recognized a bad faith exception to the statute.[2] In view of our findings, we need not address the bad faith exception to the statute provided by § 20-325a (c).

The trial court rejected the attorney trial referee's finding and concluded that the provisions of § 20-325a (b) (7) were satisfied because the defendant's husband was acting as the defendant's agent when he signed the change authorization, and the defendant subsequently ratified his actions. Judgment for $52,000, plus reasonable attorney's fees in the amount of $12,500, was entered. This appeal ensued, and the plaintiff filed a cross appeal claiming prejudgment interest from March 1, 1993.

"[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous."

---

[2] The attorney trial referee also recommended that § 20-325a (c), which was enacted by Public Acts 1994, No. 94-240, § 3, be ruled inapplicable even if effective retroactively because that statute is limited to subdivisions (2) through (6) and does not affect the signature requirement of subdivision (7). General Statutes § 20-325a (c) provides: "Nothing in subsection (a) of this section or subdivisions (2) to (6), inclusive, of subsection (b) of this section shall prevent any licensee from recovering any commission, compensation or other payment in respect to any acts done or services rendered, if such person has substantially complied with subdivisions (2) to (6), inclusive, of subsection (b) of this section and it would be inequitable to deny such recovery."

(Internal quotation marks omitted.) *Family Financial Services, Inc.* v. *Spencer*, 41 Conn. App. 754, 759, 677 A.2d 479 (1996). "A reviewing authority may not substitute its findings for those of the trier of the facts. This principle applies no matter whether the reviewing authority is the Supreme Court . . . the Appellate Court . . . or the Superior Court reviewing the findings of either administrative agencies . . . or attorney trial referees." (Citations omitted.) *Wilcox Trucking, Inc.* v. *Mansour Builders, Inc.*, 20 Conn. App. 420, 423, 567 A.2d 1250 (1989), cert. denied, 214 Conn. 804, 573 A.2d 318 (1990).

"The right of a real estate broker to recover a commission is dependent upon whether the listing agreement meets the requirements of § 20-325a (b). *New England Land Co., Ltd.* v. *DeMarkey*, 213 Conn. 612, 621, 569 A.2d 1098 (1990); *Revere Real Estate, Inc.* v. *Cerato*, 186 Conn. 74, 77, 438 A.2d 1202 (1982). Section 20-325a (b) requires that the listing agreement: '(1) be in writing, (2) contain the names and addresses of all the parties thereto, (3) show the date on which such contract was entered into or such authorization given, (4) contain the conditions of such contract or authorization and (5) be signed by the owner or an agent authorized to act on behalf of the owner only by a written document executed in the manner provided for conveyances in section 47-5, and by the real estate broker or his authorized agent.' In addition, the broker ordinarily must prove that it has found a buyer that is ready, willing and able to purchase the property on terms agreed to by the seller. *Storm Associates, Inc.* v. *Baumgold*, 186 Conn. 237, 242, 440 A.2d 306 (1982); *Revere Real Estate, Inc.* v. *Cerato*, supra, 77–78." *McCutcheon & Burr, Inc.* v. *Berman*, 218 Conn. 512, 519, 590 A.2d 438 (1991).

"It is well established that the requirements of § 20-325a (b) are mandatory rather than permissive and that the statute is to be strictly construed. *New England*

*Land Co., Ltd.* v. *DeMarkey*, supra, [213 Conn.] 623 (listing agreement must include sale price of property); *Jay Realty, Inc.* v. *Ahearn Development Corporation*, 189 Conn. 52, 54, 453 A.2d 771 (1983) (listing agreement lacking addresses of both parties unenforceable); *Thornton Real Estate, Inc.* v. *Lobdell*, 184 Conn. 228, 230–31, 439 A.2d 946 (1981) (brokerage contract signed by owner's agent unenforceable under the statute as then worded); *Hossan* v. *Hudiakoff*, 178 Conn. 381, 383, 423 A.2d 108 (1979) (failure to include broker's address fatal to listing agreement); *Rostenberg-Doern Co.* v. *Weiner*, 17 Conn. App. 294, 305–307, 552 A.2d 827 (1989) (omission of rate of broker's commission fatal); *Howland* v. *Schweir*, 7 Conn. App. 709, 713–15, 510 A.2d 215 (1986) (commission not recoverable where broker could not prove he produced a buyer during effective term of listing agreement); *Arruda Realty, Inc.* v. *Doyon*, 35 Conn. Sup. 617, 620, 401 A.2d 625, cert. denied, 176 Conn. 763, 394 A.2d 201 (1978) (owner's address requirement not satisfied even though the listing agreement included the address of the subject property, which was the same as the owner's address). 'A broker who does not follow the mandate of [§ 20-325a (b)] does so at his peril.' *Thornton Real Estate, Inc.* v. *Lobdell*, supra, 230–31." *McCutcheon & Burr, Inc.* v. *Berman*, supra, 218 Conn 520.

The trial court determined that the plaintiff should have recovered on the theory of ratification. "Ratification requires acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances." (Internal quotation marks omitted.) *CMG Realty of Connecticut, Inc.* v. *Colonnade One Ltd. Partnership*, 36 Conn. App. 653, 659, 653 A.2d 207 (1995). We affirm the judgment of the trial court, but not its reasoning, because we conclude that the requirements of § 20-325a are mandatory and because

the defendant did not sign the agreement. The requirements of § 20-325a were not satisfied. The agreement is, nonetheless, valid because we conclude that the doctrine of equitable estoppel is applicable.

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse." (Internal quotation marks omitted.) *Brock* v. *Cavanaugh*, 1 Conn. App. 138, 141–42, 468 A.2d 1242 (1984).

Although this court has refused in the past to apply equitable estoppel in favor of real estate brokers seeking commissions and against homeowners seeking to avoid paying such commissions, the present case can be factually distinguished from those decisions. In *New England Investment Properties, Inc.* v. *Spire Realty & Development Corp.*, 31 Conn. App. 682, 687–88, 626 A.2d 1316 (1993), the real estate broker did not obtain a valid listing agreement that was signed by the homeowners prior to rendering his services. In concluding that the plaintiff could not invoke equitable estoppel in that case, this court relied on its decision in *Currie* v. *Marano*, 13 Conn. App. 527, 531–32, 537 A.2d 1036, cert. denied, 207 Conn. 809, 541 A.2d 1238 (1988) (real estate broker performed services *after* listing agreement had expired). This court stated that "[t]he *Currie* court refused to apply estoppel for two reasons. First, a broker is expected to know the laws regulating his profession and when ignorance of those laws is the primary cause of his need for relief, the doctrine of estoppel does not apply. . . . Second, the *Currie* court recognized that 'General Statutes § 20-325a has been strictly construed and enforced. . . . The scenario arising most commonly in cases of real estate commission

claims, when there has not been compliance with the listing statute, as here, presents a fact pattern in which a real estate owner allegedly reaps the benefits of a broker's services without paying for them. To allow recovery on . . . the plaintiff's legal theories *in the present case* would nullify § 20-325a and emasculate the state's real estate sales licensing system.' . . . For the same reasons, we reject the plaintiff's attempt to employ equitable estoppel in this case." (Emphasis added.) *New England Investment Properties, Inc.* v. *Spire Realty & Development Corp.*, supra, 687–88.

In the present case, unlike in *Currie* and *New England Investment Properties, Inc.*, the plaintiff's ignorance of the laws governing his profession is not the cause for his need for relief. The plaintiff obtained what he believed to be a valid extension of the listing agreement that was signed by the defendant. The plaintiff was unaware that it was actually the defendant's husband that signed the extension agreement on behalf of and with the consent of the defendant. The plaintiff relied thereon to his detriment. Furthermore, permitting the plaintiff to prevail on an equitable estoppel theory in the present case would not emasculate this state's real estate licensing system because the plaintiff believed that he was operating within the requirements of the law, and the defendant and her husband allowed the plaintiff to so believe. As a result, the plaintiff's claim in the present case is factually distinguishable from cases that have precluded real estate brokers from invoking the doctrine of equitable estoppel.

The plaintiff in his cross appeal claims that the trial court improperly failed to award prejudgment interest pursuant to § 37-3a.[3] We agree.

---

[3] General Statutes § 37-3a provides in relevant part: "[I]nterest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable. . . ."

"We begin our analysis with the appropriate standard of review with respect to the award of compensatory interest. The allowance of prejudgment interest as an element of damages is an equitable determination and a matter lying within the discretion of the trial court. . . . Before awarding interest, the trial court must ascertain whether the defendant has wrongfully detained money damages due the plaintiff. . . . Interest on such damages ordinarily begins to run from the time it is due and payable to the plaintiff. . . . The determination of whether or not interest is to be recognized as a proper element of damage, is one to be made in view of the demands of justice rather than through the application of an arbitrary rule. . . . *West Haven Sound Development Corp.* v. *West Haven*, 207 Conn. 308, 321, 541 A.2d 858 (1988).

"A trial court must make two determinations when awarding compensatory interest under § 37-3a: (1) whether the party against whom interest is sought has wrongfully detained money due the other party; and (2) the date upon which the wrongful detention began in order to determine the time from which interest should be calculated. *Metcalfe* v. *Talarski*, 213 Conn. 145, 160, 567 A.2d 1148 (1989); *West Haven Sound Development Corp.* v. *West Haven*, supra, 207 Conn. 321." (Internal quotation marks omitted.) *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 734–35, 687 A.2d 506 (1997).

It is obvious from the memorandum of decision that the trial court did not address whether the plaintiff was entitled to interest under § 37-3a, even though the plaintiff requested such relief in its motion for entry of judgment to the trial court.

On the cross appeal, the judgment is reversed only as to the failure to address the plaintiff's request for an

award of prejudgment interest and the case is remanded for further proceedings on that claim.

In this opinion LANDAU, J., concurred.

LAVERY, J., concurring. I agree with the result of the majority, but I believe this court, en banc, or the Supreme Court should revisit *New England Investment Properties, Inc.* v. *Spire Realty & Development Corp.*, 31 Conn. App. 682, 687–88, 626 A.2d 1316 (1993), regarding its position on the applicability of the bad faith doctrine set forth in *Habetz* v. *Condon*, 224 Conn. 231, 618 A.2d 501 (1992), involving a section of the Home Improvement Act, General Statutes § 20-429 (a),[1] which is analogous to General Statutes § 20-325a (b).

I believe the following language from *Habetz* v. *Condon*, supra, 224 Conn. 239–40, applies to the facts in this case. "In the absence of specific legislative indication, however, we do not read the act to override the general principle embodied in the bad faith exception: that an individual should not profit from his own deceptive and unscrupulous conduct. This court never intended to advance the cause of the unscrupulous. We can only presume that the legislature had a similar intent. The question is not whether the legislature specifically carved out this bad faith exception, as the plaintiff has argued, but whether, in the absence of specific legislative indication otherwise, a doctrine founded on public policy and containing a strong strain of estoppel can prevent a misbehaving party from invoking the benefits

---

[1] General Statutes § 20-429 (a) provides in relevant part: "No home improvement contract shall be valid or enforceable against an owner unless it: (1) Is in writing, (2) is signed by the owner and the contractor, (3) contains the entire agreement between the owner and the contractor, (4) contains the date of the transaction, (5) contains the name and address of the contractor, (6) contains a notice of the owner's cancellation rights in accordance with the provisions of chapter 740, (7) contains a starting date and completion date, and (8) is entered into by a registered salesman or registered contractor. . . ."

of a statute which is absolute on its face. To deny the contractor any opportunity of recovery after he has completed his end of the bargain if he has persuaded the trier of fact that a statutory remedy is being invoked by a homeowner in bad faith would be to countenance a gross injustice and indeed to encourage its perpetuation and to assure its success." Id.

The attorney trial referee's conclusions that it would be inequitable to deny the plaintiff a recovery and that it was bad faith on the defendant's part in raising as a defense the statutory signature requirement contained in § 20-325a (b) (7) were consistent with the underlying facts found.

"A bad faith exception is designed to prevent a party's disavowal of previous conduct if such repudiation would not be responsive to demands of justice and good conscience. The law does not permit the exercise of a right to repudiate a contract when the exercise of such a right in bad faith would work an injustice. Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." Id., 238; *Fruin* v. *Colonnade One at Old Greenwich Ltd. Partnership*, 38 Conn. App. 420, 431–32, 662 A.2d 129 (1995), aff'd, 237 Conn. 123, 676 A.2d 369 (1996).[2]

---

[2] I also note that in *Fruin* v. *Colonnade One at Old Greenwich Ltd. Partnership*, supra, 38 Conn. App. 431, we relied on *Habetz* v. *Condon*, supra, 224 Conn. 239–40, and applied the bad faith exception to a claim brought under the Common Interest Ownership Act (CIOA), General Statutes § 47-200 et seq. "Although the language of CIOA is not similar to that in [the Home Improvement Act (HIA)], HIA is similar to CIOA in that its 'objective . . . is to promote understanding by the consumer, to ensure his ability to make an informed decision and to protect him from substantial work by an unscrupulous contractor. See *Habetz* v. *Condon*, [supra, 239]. Both statutes, then, are essentially consumer protection statutes. We, therefore, turn to cases interpreting HIA to guide our resolution of the present case." *Fruin* v. *Colonnade One at Old Greenwich Ltd. Partnership*, supra, 430. "As in the HIA cases, allowing the plaintiff to use CIOA to shield his

I would apply the bad faith exception doctrine to this case rather than equitable estoppel.

refusal to perform his contractual duties 'would not be responsive to demands of justice and good conscience.' *Habetz* v. *Condon*, supra, [238]. We, therefore, incorporate the HIA's 'bad faith' exception to apply to CIOA cases." *Fruin* v. *Colonnade One at Old Greenwich Ltd. Partnership*, supra, 433.