DOW AND CONDON, INC. *v.* MUROS NORTH
LIMITED PARTNERSHIP
(AC 21090)

Mihalakos, Flynn and Daly, Js.

Argued October 22, 2001—officially released April 16, 2002

*Glenn T. Terk,* for the appellant (plaintiff).

*Karl Fleischmann,* for the appellee (defendant).

FLYNN, J. This appeal arises from the trial court's judgment for the defendant, rendered after a trial to the court, denying recovery of a sale commission sought by the plaintiff, a real estate brokerage corporation. On appeal, the plaintiff claims that the trial court improperly (1) determined that the plaintiff failed to comply with the statutory prerequisites to recovering a real estate commission, described in General Statutes (Rev. to 1997) § 20-325a, and (2) applied the common law of contracts. We affirm the judgment of the trial court.

The following facts and procedural history are undisputed. Donald Mondani was a licensed real estate broker who worked for the plaintiff, Dow and Condon, Inc., in 1998.[1] At that point, Mondani had cultivated a business relationship with Joseph Sullo, a real estate investor. Over the course of a decade, Mondani assisted Sullo in several real estate transactions.

In October, 1998, Sullo sought to purchase a building to house a restaurant supply business. Mondani and Sullo were "driving around looking for [suitable] buildings" in Hartford when they noticed the defendant's property, located on 280-320 Murphy Road. Sullo was interested in the property and asked Mondani to "find out who owns it" and to "see what we can buy [it] for." Mondani investigated the land records and discovered that the defendant, Muros North Limited Partnership, owned the property. Mondani contacted the sole general partner, Stephen Owens, and informed him that a buyer was interested in the property and asked if he was interested in selling. Owens responded that he "hadn't thought about it" but would consider a proposal.

Mondani consulted with Sullo and obtained authorization to send a "letter of intent to purchase" the prop-

---

[1] Mondani was also a shareholder and officer in the corporation in 1998.

erty at the price of $2.2 million. On Friday, October 30, 1998, Mondani faxed this document to Owens along with a document proposing an open listing agreement. A "listing agreement" is an employment contract for the services of a real estate broker. *Revere Real Estate, Inc.* v. *Cerato,* 186 Conn. 74, 77, 438 A.2d 1202 (1982). The terms of the proposal included a commission rate of 4.5 percent, applied to the same $2.2 million price suggested in the letter of intent, i.e., a commission of $99,000. Mondani signed each of these documents, signing on Sullo's behalf in the case of the intent to purchase.

On the facsimile of the listing that he received, Owens struck out the proposed price term, as well as the commission rate, and penned in changes to $2.55 million and 2.5 percent, respectively. Owens made the same change to the price figure on the intent to purchase document. Owens placed his initials next to each change and signed the documents. He faxed the documents to Mondani on the following Monday, November 2, 1998, three days after Mondani's fax.

After receiving the documents, Mondani never initialed or signed the modified documents. At trial, Mondani testified that he "believed" he had a telephone conversation with Owens where he, Mondani, voiced his assent to the changes. Owens testified that no such oral assent ever took place and that, in fact, he and Mondani never even spoke to one another again after the initial telephone call when Mondani inquired as to whether Owens would consider selling the property. The trial court never found that the plaintiff's version of these events had occurred.

Sullo never agreed to purchase at the price indicated in Owens' modifications. As Sullo testified at trial, Owens "was fixed on one price" and Sullo "wanted to pay another price." Sullo decided to deal with Owens directly after Owens faxed the conflicting terms, in

order to "see whether or not [he] could make the deal." Sullo obtained Owens' telephone number from Mondani and called Owens "within a few days" after the changes were faxed. In that conversation, Owens described the building to Sullo, including such details as "the condition of the building, its cash flow, [and] the rent roll . . . ." In describing these details, Owens hoped to justify the higher price that he had proposed.

Roughly two weeks after talking to Sullo, on November 16, 1998, Owens faxed Mondani a letter. The letter began by recounting the previous fax transmissions, and continued: "During the weeks which followed, you have not agreed to, or even responded to, my counterproposal, nor have you acted to represent [the defendant's] interests. Accordingly, I hereby withdraw the proposal of 11/2/98 [the proposed listing agreement with the changed price and commission terms]."

Owens testified that during this two week period, he had not heard from Sullo either. Nonetheless, at some point after November 16, 1998, Sullo recontacted Owens. Ultimately, they consummated a sale at a new price: $2.25 million, a price which was $50,000 more than Sullo originally had offered but $300,000 less than Owens had set in his fax. Later, through Sullo, Mondani learned that the deal had been struck. Mondani then commenced this action, in which he sought to recover a commission of 2.5 percent, calculated on the basis of the price actually realized.

In an oral ruling from the bench, the trial court rendered judgment for the defendant on multiple alternative grounds. First, the court found that the plaintiff could not recover a real estate brokerage commission due to noncompliance with § 20-325a. Second, the court found that in any event, under contract principles, the plaintiff had failed to perform substantially according

to the terms of the alleged contract.[2] The plaintiff challenges both of these grounds on appeal.

The trial court found that the plaintiff failed to comply with § 20-325a and was therefore barred from recovering a real estate commission. Specifically, the court found that the contract was not "accepted in writing" by the plaintiff. The plaintiff maintains that the documents faxed by Owens to Mondani, with new proposed terms, satisfied § 20-325a.

It is the duty of the appellant to provide us with an adequate record to review its claims on appeal. Practice Book §§ 60-5, 61-10; cf. *Spero* v. *Zoning Board of*

---

[2] The transcript of the court's ruling reads:

"There's a case called *Klein* v. *Chatfield*, 166 Conn. 76, 347 A.2d 58 (1974), and in the middle of page seventy-eight, the Supreme Court says the trial court concluded that the document signed by the Chatfields was an offer, that an essential requirement of that offer was the delivery to them by the plaintiffs of an executed contract and a deposit of $3000, that until both steps were taken by the plaintiffs the parties were free to disengage from their tentative commitments, and they did disengage in that case, and the Supreme Court decided for the defendant.

"You never got as far as I'm concerned a true contract because there was a counteroffer, and it was not accepted in writing, which the statute requires us to have, never mind the statute of frauds, which we haven't talked about, but the common law alone says there's no contract. The statute even with six and (c) in it or five and (c) in it does not do the job of substantial compliance.

"Inequity, it's possible the court could find an inequity, but I don't have enough evidence before me to do that. It looks on its face like a bad result, but I can't decide here today that it is inequitable.

"The plaintiff did provide a buyer ready, willing and able, which is clear from the fact that they closed, but that doesn't do the job for his contract. He has to have had a contract to do that and to be paid for it, and the same is true with Mr. Sullo. He didn't agree on its face to the numbers that we have.

"Could I see the exhibits, please?

"Mr. Sullo, as far as I see, never agreed to a sale price of $2,550,000. That's not what he bought it at. He bought it at $2,250,000. That was initialed by Mr. Owens. The two and a half percent change was initialed by him.

"We don't know whatever happened to the environmental compliance requirement. The only thing that's written on there is to be negotiated; and if there's anything in this world that isn't clear, it's what you're going to negotiate an environmental protection requirement for.

"In my view, an authorization means pretty much the same thing as a contract because it also must be in writing.

*Appeals*, 217 Conn. 435, 439 n.2, 586 A.2d 590 (1991); 1 B. Holden & J. Daly, Connecticut Evidence (2d Ed. 1988) § 60i, p. 387. We are not free, absent such a record, to make assumptions or to speculate about findings not made. *State* v. *Combs*, 51 Conn. App. 700, 701–702, 725 A.2d 349 (1999).

Next, we set forth the standard of review of the trial court's judgment. "To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous." (Internal quotation marks omitted.) *Torres* v. *Waterbury*, 249 Conn. 110, 118, 733 A.2d 817 (1999). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Premier Capital, Inc.* v. *Grossman*, 68 Conn. App. 51, 59, 789 A.2d 565 (2002). The issue before us involves the interpretation of § 20-325a. "Statutory interpretation is a matter of law over which this court's review is plenary." (Internal quotation marks omitted.) *Berkley* v. *Gavin*, 253 Conn. 761, 769, 756 A.2d 248 (2000). Furthermore, our Supreme Court has specifically stated that "[w]hether a particular listing agreement complies with § 20-325a (b) is a question of law." *New England Land Co., Ltd.* v. *DeMarkey*, 213 Conn. 612, 623, 569 A.2d 1098 (1990). In a plenary review of the trial court's legal findings, "we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Torres* v. *Waterbury*, supra, 118–19.

With these principles in mind, we turn to the question of whether the trial court properly determined that the

"Therefore, the court will enter judgment for the defendant because the plaintiff has not sustained his burden of proof in this action. Thank you."

plaintiff failed to comply with § 20-325a, barring recovery of a sale commission. "The right of a real estate broker to recover a commission is dependent upon whether the listing agreement meets the requirements of § 20-325a (b)." (Internal quotation marks omitted.) *Rapin* v. *Nettleton*, 50 Conn. App. 640, 647, 718 A.2d 509 (1998). Section 20-325a (b) conditions the recovery of a real estate sale commission on, inter alia, the existence of a "contract or authorization" for brokerage services that is "in writing" and "signed by the real estate broker or the real estate broker's authorized agent . . . ." General Statutes (Rev. to 1997) § 20-325a (b) (1) and (5). For many years after its enactment, the provisions of § 20-325a (b) were "strictly construed and enforced." (Internal quotation marks omitted.) *New England Investment Properties, Inc.* v. *Spire Realty & Development Corp.*, 31 Conn. App. 682, 687, 626 A.2d 1316 (1993). Under this strict reading, a real estate broker who failed to comply with any of the provisions of § 20-325a did so "at his peril." (Internal quotation marks omitted.) *Levey Miller Maretz* v. *595 Corporate Circle*, 258 Conn. 121, 131, 780 A.2d 43 (2001).

In 1994, the legislature relaxed the standard of strict compliance with § 20-325a with respect to several of its provisions. While a written agreement is still strictly required, No. 94-240 of the 1994 Public Acts amended § 20-325a such that a real estate broker may recover a sales commission if the broker "has substantially complied with subdivisions (2) to (6), inclusive, of [§ 20-325a (b)] and it would be inequitable to deny recovery." General Statutes (Rev. to 1997) § 20-325a (c). The requirement that the contract or authorization be signed by the broker or his authorized representative falls within subdivisions (2) to (6), requiring substantial rather than strict compliance.

In its oral ruling from the bench, the trial court stated that the contract was not "accepted in writing" and that

therefore the plaintiff was barred from recovering a commission. The undisputed facts were that Owens had faxed the revised proposed listing agreement to Mondani, the broker, but that Mondani had never signed this written offer, nor did he return it so signed to Owens.

The plaintiff concedes that Mondani did not sign the revised proposed listing agreement. The plaintiff argues, however, that there was testimonial evidence from Mondani that he believed he had agreed orally on behalf of the plaintiff to the defendant's terms, including the higher listing price and lower sale commission. The defendant denied that this oral agreement ever took place. In its brief, the plaintiff states: "If Mr. Mondani had initialed the document that was sent to him by Dr. Owens, this listing agreement would have strictly complied with all of the requirements of § 20-325a (b). The only deficiency is that Mr. Mondani did not initial the changes. *Mr. Mondani testified that he did agree to the 2.5 [percent] commission and communicated this agreement to the defendant. . . .* The situation presented in this case is exactly the type of situation that the legislature sought to address when it enacted Public Act 94-240." (Emphasis added.)

The plaintiff's argument is that while it did not strictly comply with the statutory requirement that a listing agreement be signed, it substantially complied by agreeing orally to the defendant's written listing terms.

The first difficulty with this argument is that it depends on the factual linchpin that the plaintiff did in fact agree orally to the terms of the listing agreement proposed by the defendant. Yet the plaintiff has not provided an adequate record to review this claim. The court made no finding that any oral acceptance by the plaintiff had occurred.[3] The court's decision was made

---

[3] See footnote 2.

orally. The record does not contain a written memorandum of decision setting forth the trial court's findings, nor does it contain a signed transcript setting forth the same.[4] The plaintiff filed no notice pursuant to Practice Book § 64-1 (b) stating that a signed transcript had not been filed. The plaintiff did not file a motion for articulation requesting the court to set forth its factual findings as to whether an oral agreement to Owens' written terms had been reached, on which this specific claim of substantial compliance is dependent. In sum, the plaintiff has not provided us with an adequate record for review.

In any event, the trial court's ruling that the plaintiff failed to comply with § 20-325a (b) is sustainable on independent grounds. "Substantial compliance" with § 20-325a (b) is inadequate if the plaintiff does not establish that it would "be inequitable to deny . . . recovery." See General Statutes (Rev. to 1997) § 20-325a (c). The trial court specifically found that the plaintiff had failed to establish that it would be inequitable to deny recovery. "[E]quitable determinations that depend on the balancing of many factors are committed to the sound discretion of the trial court." (Internal quotation marks omitted.) *Wendell Corp. Trustee* v. *Thurston*, 239 Conn. 109, 114, 680 A.2d 1314 (1996). The determination of whether a particular set of circumstances was unjust is essentially a factual finding for the trial court. *Paulsen* v. *Kronberg*, 66 Conn. App. 876, 878, 786 A.2d 453 (2001). In the closely related context of unjust enrichment, our Supreme Court has held that "the trial court's determination must stand unless it is clearly erroneous or involves an abuse of discretion. *Hartford Whalers Hockey Club* v. *Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 283, 649 A.2d 518 (1994)." *Wendell Corp. Trustee* v. *Thurston*, supra, 114.

---

[4] Practice Book § 64-1 provides that a court may state its decision orally.

Reviewing the entire record, we are not left with the impression that this ruling was clearly erroneous. Rather, a persuasive interpretation of the circumstances is that the broker, Mondani, chose not to follow his common practice of assenting to terms that were proposed in writing and signed by also signing the terms. The record discloses that Mondani was not pleased with the different sale commission terms proposed by Owens. Mondani's own testimony reveals that any efforts to bring the deal to closure after Owens' counterproposal, which had introduced terms less favorable to Mondani, were with Sullo, not Owens or any other representative of the defendant. Sullo's testimony was that he obtained Owens' telephone number to try to make the deal himself.[5] We note that Owens and Mondani each proposed an open listing, as distinguished from an exclusive listing, where one listing agent enjoys the exclusive right to sell.[6] "When, as in the case at bar, the agency is not an exclusive one, the broker's efforts must be the predominating producing cause of the sale." *Marshall* v. *Sturgess & Jockmus,*

[5] Mondani stated that subsequent to the October 30, 1998 proposal, he received a document called a "rent roll," which described the current tenants leasing the property from the defendant, the area they occupied and the amount of rent they paid. At trial, Mondani could not recall whether Sullo or Owens had furnished him with the rent roll. Mondani testified that he "talked to Joe Sullo about the tenants, about the property, [and] about market conditions" after Owens indicated the changes to the proposal.

[6] "[T]hree types of real estate listing agreements have traditionally been used in this state . . . . Those categories are: [1] the open listing, under which the property owner agrees to pay to the listing broker a commission if that broker effects the sale of the property but retains the right to sell the property himself as well as the right to procure the services of any other broker in the sale of the property; [2] the exclusive agency listing, which is for a time certain and authorizes only one broker to sell the property but permits the property owner to sell the property himself without incurring a commission . . . and [3] the exclusive right to sell listing, under which the sale of the property during the contract period, no matter by whom negotiated, obligates the property owner to pay a commission to the listing broker." (Citations omitted.) *Real Estate Listing Service, Inc.* v. *Real Estate Commission,* 179 Conn. 128, 132, 425 A.2d 581 (1979).

*Inc.*, 150 Conn. 59, 62, 185 A.2d 472 (1962). In any event, the testimony as to what efforts Mondani made after Owens' fax could have been entirely disbelieved by the trial court. Mondani's efforts in finding someone interested in the property prior to the counterproposal were significant. However, a broker "ordinarily must prove that it has found a buyer that is ready, willing and able to purchase the property on terms agreed to by the seller." (Internal quotation marks omitted.) *Rapin* v. *Nettleton*, supra, 50 Conn. App. 647; see also *Storm Associates, Inc.* v. *Baumgold*, 186 Conn. 237, 242, 440 A.2d 306 (1982). On the state of the record before us, the trial court's determination that the plaintiff had not established the statutorily required inequity in denying recovery of a sale commission is not clearly erroneous or an abuse of discretion.

Because these conclusions are dispositive, we do not address the defendant's remaining claims.

The judgment is affirmed.

In this opinion the other judges concurred.