******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

NRT NEW ENGLAND, LLC *v.* CHRISTOPHER
G.L. JONES
(AC 37107)

DiPentima, C. J., and Prescott and Harper, Js.

*Argued October 19, 2015—officially released February 9, 2016*

(Appeal from Superior Court, judicial district of New Haven, Hon. William L. Hadden, Jr., judge trial referee.)

*John A. Parese*, with whom were *Louis M. Federici* and, on the brief, *Giovanni R. D'Amico*, for the appellant (defendant).

*Thomas E. Crosby*, for the appellee (plaintiff).

*Opinion*

HARPER, J. In this breach of contract action, the defendant, Christopher G.L. Jones, appeals from the judgment of the trial court, rendered after a trial to the court, awarding the plaintiff, NRT New England, LLC, doing business as Coldwell Banker Residential Brokerage, certain commissions for real estate brokerage services. On appeal, the defendant claims that the court improperly (1) determined that the brokerage agreement between the parties was enforceable because (a) it does not substantially comply with the requirements of General Statutes § 20-325a (b),[1] which sets forth the conditions under which brokers may bring legal actions for brokerage services rendered, and (b) the facts and circumstances of the present case do not make it inequitable to deny the plaintiff recovery; (2) found that it was not feasible for the plaintiff to seek compensation from the seller or the seller's agent, as the plaintiff was required to do pursuant to the parties' agreement; (3) calculated the amount of the plaintiff's commission at 2.5 percent of the purchase price instead of 2 percent; and (4) granted the plaintiff a commission on the one-half interest in the property owned by the defendant's wife. We affirm the judgment of the court.

The following facts and procedural history are relevant to the resolution of this appeal. The defendant met Andrea Woolston, a licensed realtor working as an independent contractor of the plaintiff, in October, 2010. The defendant expressed to Woolston a desire to purchase a home for himself and his then fiancée, Katherine Wiltshire. One of the first things Woolston asked the defendant was whether he was represented by another agent. The defendant responded that he was not. After a number of conversations about the defendant's needs and wishes, the parties executed an exclusive right to represent buyer agreement (agreement), which established, among other things, that Woolston was the defendant's exclusive agent for finding, negotiating, and purchasing property. Over the next several months, Woolston devoted a substantial amount of time searching for properties for the defendant to purchase. Specifically, Woolston researched available properties at six town halls in the communities in which the defendant was interested. She showcased a number of properties personally to the defendant and Wiltshire and introduced many more to them through e-mail. Woolston and the defendant had at least twenty appointments where they viewed multiple properties. Additionally, Woolston visited many properties alone to determine if they were suitable for the defendant. Altogether, Woolston spent hundreds of hours seeking a suitable home for the defendant.

The agreement was in effect from January 11, 2011 until July 11, 2011, and set forth the geographical area that the defendant was interested in and the rate of

compensation for the plaintiff's services. With respect to geographical area, the parties agreed that Woolston would seek properties in Killingworth, Guilford, Essex, Old Saybrook, Deep River, Lyme, and Old Lyme. With respect to compensation, the defendant agreed to pay the plaintiff a commission equal to 2.5 percent of the purchase price of the property "if the [defendant] or any person or entity acting on the [defendant's] behalf purchases, options, exchanges, leases or trades any property, through the efforts of anyone, including the [defendant] . . . ." The agreement imposed the following duties on the defendant: "The [defendant] will not deal directly with any other broker, agent or licensee during the term of this [a]greement. The [defendant] will notify other brokers, agents or licensees at first contact that the [defendant] is being exclusively represented by [the plaintiff]. The [defendant] will disclose to [the plaintiff] any past and/or current contacts for any real property or with any other real estate broker or agent." The agreement also contains the following clause concerning compensation: "[The plaintiff] will, whenever feasible, seek compensation from the [s]eller or the [s]eller's agent; but, advises the [defendant] that such compensation: (1) is not always offered, and (2) may not be equal to the [c]omission called for hereunder." (Emphasis omitted.)

On May 10, 2011, the defendant informed Woolston via e-mail that he and Wiltshire purchased property at 300 Vineyard Point Road in Guilford for $1,375,000. The defendant learned of this property on May 4, 2011, from Mary Jane Burt, a realtor with H. Pearce Real Estate (H. Pearce), who previously had represented Wiltshire with the sale of her house in Hamden. Woolston subsequently confronted the defendant and eventually learned that he and Wiltshire previously had executed an exclusive right to represent buyer agreement with Burt and H. Pearce. This agreement was in effect from August 1, 2010, until August 1, 2011, and contained a provision designating Burt as the exclusive agent for the defendant and Wiltshire. Thus, at the time the defendant purchased the property in Guilford, he was under contract for exclusive agency with both Woolston and Burt. The defendant never told Woolston or Burt that he had two agreements in effect at the same time. Woolston notified her superiors of what had transpired, the defendant and Wiltshire closed on the property, and the plaintiff subsequently placed a broker's lien on the property for $34,375, which represents 2.5 percent of the purchase price.

On or about July 10, 2012, the plaintiff filed a two count complaint against the defendant. In count one, the plaintiff sought to foreclose its broker's lien against the defendant's property.[2] Count two is a breach of contract claim. After a trial to the court, the court issued a memorandum of decision on July 28, 2014. The court found that the plaintiff had proven the allegations in

its breach of contract count and damages. The court's judgment on the plaintiff's breach of contract claim was supported by two important determinations. First, the court rejected the defendant's contention in his posttrial brief that the agreement did not comply with § 20-325a (b). Second, the court rejected the defendant's contention that the plaintiff was not entitled to recovery due to its failure to seek compensation from the seller or the seller's agent, reasoning that there was no basis for the plaintiff to seek compensation because the plaintiff rendered no services toward the acquisition of 300 Vineyard Point Road. The court awarded the plaintiff $34,375 in damages plus attorney's fees and costs. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the agreement was unenforceable. Specifically, he argues that the court improperly (1) held that the agreement substantially complied with § 20-325a (b), and (2) found that it was inequitable to deny the plaintiff recovery. We disagree with both of the defendant's arguments, and we will address each in turn.

A

Substantial Compliance

The defendant claims that the agreement does not substantially comply with § 20-325a (b). We begin with the standard of review. "Because the [defendant's] claim is premised on the view that no recovery may be had unless there is substantial compliance with § 20-325a, we first must consider to what extent the plaintiff satisfied the requirements of that statute. . . . To the extent that we are required to review conclusions of law or the interpretation of the relevant statute by the trial court, we engage in plenary review. . . . We review the court's factual findings, however, under a clearly erroneous standard." (Citation omitted.) *Location Realty, Inc.* v. *Colaccino*, 287 Conn. 706, 717, 949 A.2d 1189 (2008). The defendant's claim that the agreement does not substantially comply with the statute warrants plenary review because "[w]hether a particular listing agreement complies with § 20-325a (b) is a question of law." *New England Land Co., Ltd.* v. *DeMarkey*, 213 Conn. 612, 623, 569 A.2d 1098 (1990); see also *QuesTech Financial, LLC* v. *Benni's, LLC*, 105 Conn. App. 749, 752 n.2, 939 A.2d 1220 ("[w]e afford plenary review to . . . questions of law" [internal quotation marks omitted]), cert. denied, 287 Conn. 916, 951 A.2d 567 (2008).

We turn next to the relevant text of the statute. Section 20-325a (b) sets forth seven separate items that must appear in brokerage contracts for a broker, such as the plaintiff, to recover for services rendered. The contract must "(1) [b]e in writing, (2) contain the names

and addresses of the real estate broker performing the services and the name of the person or persons for whom the acts were done or services rendered, (3) show the date on which such contract was entered into or such authorization given, (4) contain the conditions of such contract or authorization, (5) be signed by the real estate broker or the real estate broker's authorized agent, (6) if such contract or authorization pertains to any real property, include the following statement: 'THE REAL ESTATE BROKER MAY BE ENTITLED TO CERTAIN LIEN RIGHTS PURSUANT TO SECTION 20-325a OF THE CONNECTICUT GENERAL STATUTES', and (7) be signed by the person or persons for whom the acts were done or services rendered or by an agent authorized to act on behalf of such person or persons . . . ." General Statutes § 20-325a (b).

The defendant takes issue with the agreement's compliance with subsection (b) (6) of § 20-325a, which requires brokers to give notice to consumers of brokers' lien rights. The text of the lien notice in the agreement is as follows: "The real estate broker may be entitled to certain lien rights pursuant to subsection (d) of Section 20-325a of the Connecticut General Statutes." The defendant argues that this lien notice is deficient for two reasons. First, the defendant notes that the text of the lien notice was not capitalized in the agreement, but that it is capitalized in § 20-325a (b) (6). He claims that because this language is capitalized in the statute, it must be capitalized in the agreement, and the plaintiff's failure to capitalize this important notice to consumers renders the agreement noncompliant. Second, he claims that the agreement is deficient because it erroneously references subsection (d) of § 20-325a, which does not pertain to lien rights at all. Instead, the defendant claims, the notice should have referenced subsection (e), which sets forth brokers' lien rights.[3] Because of these deficiencies, the defendant argues, the agreement does not substantially comply with § 20-325a (b), and is consequently unenforceable.

"The right of a real estate broker to recover a commission is dependent upon whether the listing agreement meets the requirements of § 20-325a (b). . . . It is well established that the requirements of § 20-325a (b) are mandatory rather than permissive and that the statute is to be strictly construed. . . . A broker who does not follow the mandate of [§ 20-325a (b)] does so at his peril." (Citations omitted; internal quotation marks omitted.) *Tolk* v. *Williams*, 75 Conn. App. 546, 552–53, 817 A.2d 142 (2003).

Subsection (d) of § 20-325a, however, creates an exception to the requirements of subsection (b). See *Location Realty, Inc.* v. *Colaccino*, supra, 287 Conn. 718–19. Section 20-325a (d) provides in relevant part: "Nothing in . . . subdivisions (2) to (7), inclusive, of subsection (b) of this section . . . shall prevent any

licensee from recovering any commission, compensation or other payment with respect to any acts done or services rendered, *if it would be inequitable to deny such recovery and the licensee . . . has substantially complied with subdivisions (2) to (7), inclusive, of subsection (b) of this section . . . .*" (Emphasis added.) "Therefore, subsection (d) provides that, when . . . there is no strict compliance with the requirements of [subsection (b)], an action for a real estate commission under § 20-325a nonetheless may proceed if two preconditions are met: (1) there has been substantial compliance with the requirements relevant to the transaction; and (2) the facts and circumstances of a case would make it inequitable to deny recovery." *Location Realty, Inc.* v. *Colaccino*, supra, 719.

With these principles in mind, we conclude that the agreement substantially complied with the requirements of the statute. To begin with, we disagree that § 20-325a (b) (6) requires lien notices to appear in all capital letters. Although we recognize that the sample lien notice in § 20-325a (b) (6) appears in all capital letters in the text of the statute, we agree with the trial court that if the legislature intended to require brokers to capitalize the lien notice in brokerage contracts, it easily could have employed language to express that intent. See *Dept. of Public Safety* v. *Freedom of Information Commission*, 298 Conn. 703, 729, 6 A.3d 763 (2010); *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 299, 933 A.2d 256 (2007). The legislature did, in fact, explicitly require written disclosures to be capitalized in a different section of the same statutory scheme.[4] General Statutes § 20-325c (b)[5] sets forth a number of mandatory disclosures real estate brokers must make to consumers when acting dually as mortgage brokers. Subsection (c) of § 20-325c then provides that "[s]uch disclosure[s] shall include the following notice *printed in at least ten-point boldface capital letters* . . . ." (Emphasis added.) Thus, the text of the notice requirements in §§ 20-325a (b) (6) and 20-325c (c) is capitalized, but only in the latter statute has the legislature explicitly instructed brokers to denote the required notice in a particular and conspicuous way, namely, by boldface, capital type not less than ten point size. The legislature's direction to brokers to capitalize written disclosures in one section of the statutory scheme strongly supports our conclusion that it intended to omit such a requirement from § 20-325a (b) (6).

Additionally, the legislature explicitly has mandated notice requirements to appear in all capital letters in other provisions within title 20. For example, General Statutes § 20-417d (a), a provision of the New Home Construction Contractors Act, § 20-417a et seq., requires new home construction contractors to execute written agreements with consumers that contain a number of mandatory disclosures. Subsection (c) of § 20-

417d then provides that "[t]he written notice required in subsection (a) of this section *shall be in capital letters* not less than ten-point bold face type . . . ." (Emphasis added.) Further, General Statutes § 20-402a, which sets forth rules controlling the sale of hearing aids, contains a requirement in subsection (b) that buyers must be notified "*in all capital letters* of no less than twelve point boldface type of uniform font and in an easily readable style" of their right to cancel the sale under certain circumstances. (Emphasis added.) On the basis of the foregoing, we conclude that the legislature did not intend to require the lien notice set forth in § 20-325a (b) (6) to be capitalized. To require the plaintiff to do so would be to inject requirements into the statute that the legislature did not intend, which we are not permitted to do. See *Raftopol* v. *Ramey*, 299 Conn. 681, 722, 12 A.3d 783 (2011) ("[w]e are not permitted to supply statutory language that the legislature may have chosen to omit" [internal quotation marks omitted]).

The defendant also claims that the agreement's reference to the wrong subsection of § 20-325a renders it noncompliant. We reject this claim. The purpose of subsection (d) is to avoid the harsh results that occurred when the law previously required strict compliance with § 20-325a (b). Our Supreme Court's discussion in *Location Realty, Inc.* v. *General Financial Services, Inc.*, 273 Conn. 766, 873 A.2d 163 (2005), of the legislative history of subsection (d), then (c), is illustrative of this purpose. "The legislative history indicates that the proposal [to adopt subsection (d)] was brought forth in response to certain decisions of this court that strictly construed the requirements of § 20-325a (b), namely, the formal requirements of a listing agreement, and denied brokers the right to recover for failures of strict compliance therewith. . . . That history indicates that the task force that drafted the legislation considered that the strict construction of subsection (b) of § 20-325a had resulted in some cases of 'unjust enrichment.' " (Citations omitted.) Id., 780. To accept the defendant's position, namely, that an erroneous reference to a subsection of the statute does not constitute substantial compliance, would foreclose brokers from pursuing recovery on the basis of what is essentially a scrivener's error—a harsh result in our view. See *Tayco Corp.* v. *Planning & Zoning Commission*, 294 Conn. 673, 686, 986 A.2d 290 (2010) ("[W]e construe a statute in a manner that will not thwart its intended purpose or lead to absurd results. . . . We must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve." [Internal quotation marks omitted.]).

On the basis of the foregoing analysis, we conclude that the agreement substantially complied with § 20-325a (b).

B

## Equitable Considerations

The defendant also claims that the court abused its discretion when it determined that it would be inequitable to deny the plaintiff recovery. We disagree.

As a preliminary matter, the parties dispute the appropriate standard of review. The plaintiff argues that we should review this claim under the clearly erroneous standard. The defendant insists that plenary review is required. We agree with the plaintiff and, accordingly, review this claim under the clearly erroneous standard. See *Dow & Condon, Inc.* v. *Muros North Ltd. Partnership*, 69 Conn. App. 220, 228, 794 A.2d 554 (2002) ("[E]quitable determinations that depend on the balancing of many factors are committed to the sound discretion of the trial court. . . . The determination of whether a particular set of circumstances was unjust is essentially a factual finding for the trial court." [Citation omitted; internal quotation marks omitted.]); see also *State* v. *Krijger*, 313 Conn. 434, 446, 97 A.3d 946 (2014) ("[A] . . . trial court's findings of fact are not to be overturned on appeal unless they are clearly erroneous. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." [Internal quotation marks omitted.]).

There is ample evidence in the record to support the court's conclusion that denying the plaintiff relief would be inequitable. Woolston testified, and the defendant himself conceded, that she rendered a significant amount of services to the defendant over several months. Specifically, Woolston researched properties at town halls for availability and encumbrances, contacted property owners, arranged personal visits, prepared and presented literature to the defendant on available properties, and attended appointments with the defendant and Wiltshire. Woolston spent hundreds of hours working for the defendant in total. The defendant, on the other hand, accepted Woolston's services while under contract with another agent in violation of the agreement. Indeed, the defendant acknowledged that he was untruthful with Woolston at the beginning of their relationship when he told her that he was not represented by another agent. In fact, he was scheduling appointments and viewing properties with both Woolston and Burt at approximately the same time in May, 2011. For example, the defendant e-mailed Woolston on May 2, 2011, thanking her for showing him a property. Approximately one week later, the defendant e-mailed Woolston to inform her that he viewed 300 Vineyard Point Road with Burt and had "put in an all cash bid that has been accepted . . . ."

The defendant nevertheless argues that it would not

be inequitable to deny recovery to the plaintiff because Woolston performed no services in connection with his purchase of 300 Vineyard Point Road. We are not persuaded. The defendant agreed to pay a commission "equal to 2.5 % of the purchase price if the [defendant] or any person or entity acting on the [defendant's] behalf purchases . . . any property, *through the efforts of anyone*, including the [defendant], where an agreement to purchase the property was entered into during the [t]erm of this [a]greement." However unjust this result may seem to the defendant in hindsight, we cannot say it is inequitable because it is precisely what he agreed to.

II

The defendant next claims that the court improperly determined that it was not feasible for the plaintiff to seek compensation from the seller or the seller's agent. We disagree.

The following facts are relevant to our resolution of this claim. The agreement contains the following clause: "[The plaintiff] will, whenever feasible, seek compensation from the [s]eller or the [s]eller's agent; but, advises the [b]uyer that such compensation: (1) is not always offered, and (2) may not be equal to the [c]omission called for hereunder." (Emphasis omitted.) At trial, the plaintiff called Woolston; Brendan Grady, the plaintiff's regional vice president; and Joan Davis-Clark, the plaintiff's sales manager in its Madison office. Woolston, Grady, and Davis-Clark all testified that the plaintiff did not seek compensation from the seller's agent, William Pitt-Sotheby's International Realty (Sotheby's). They each testified that Woolston did not perform any services for the defendant in connection with his purchase of 300 Vineyard Point Road. They explained that because Woolston did not perform any services leading to the defendant's purchase of the property, the plaintiff was not the procuring cause of the purchase, which Grady described as "an unbroken chain of events that leads to a purchase . . . ." In the absence of procuring cause, they explained, it was not feasible to seek compensation from Sotheby's. Instead, Davis-Clark testified that she reached out to representatives of H. Pearce, explained to them that the plaintiff had the defendant under an exclusive right to represent buyer agreement, and unsuccessfully attempted to recover Woolston's commission from H. Pearce. On the basis of this testimony, the court found that Woolston was not the procuring cause and, consequently, that it was not feasible for the plaintiff to seek compensation from Sotheby's.

Because the court relied on evidence of facts outside of the agreement, namely, the parties' testimony, in finding that it was not feasible for the plaintiff to seek compensation from Sotheby's, we review this claim for clear error. See generally *Sunset Gold Realty, LLC* v. *Premier Building & Development, Inc.*, 133 Conn. App. 445, 452, 36 A.3d 243, cert. denied, 304 Conn. 912, 40

A.3d 319 (2012). The defendant claims that the court's finding was clearly erroneous, arguing that it was entirely feasible for the plaintiff to *seek* compensation from Sotheby's, regardless of the likelihood that Sotheby's would *actually pay*. The defendant insists that a simple demand on the seller or the seller's agent would have sufficed to satisfy the plaintiff's contractual obligation. We disagree. It is well established that "[t]he law does not require an act which would be a mere futility." (Internal quotation marks omitted.) *Vachon* v. *Tomascak*, 155 Conn. 52, 57, 230 A.2d 5 (1967). Woolston, Grady, and Davis-Clark all concluded that because Woolston did not perform any services in connection with the defendant's purchase of the property, the plaintiff had no basis to make a claim for payment from Sotheby's. In other words, the substance of this testimony was that it would have been impossible to obtain compensation from Sotheby's and, therefore, it would have been futile to ask. The court credited this testimony, and the defendant did not offer any evidence to contradict or undermine these witnesses. For these reasons, we conclude that the court's finding was not clearly erroneous.

### III

The defendant's final two claims are that the court erroneously calculated the amount of the commission to which the plaintiff was entitled and the court improperly granted the plaintiff a commission on the one-half interest in the property owned by the defendant's wife. We decline to address these claims because the defendant has briefed them inadequately.

"[W]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (Citation omitted; internal quotation marks omitted.) *State* v. *Prosper*, 160 Conn. App. 61, 74–75, 125 A.3d 219 (2015).

First, the defendant claims that, to the extent that the plaintiff was entitled to compensation at all, the court should not have awarded a commission equal to 2.5 percent of the purchase price, as set forth in the agreement. Instead, the defendant claims, the plaintiff

should have been awarded a commission in the amount of 2 percent, which is the amount set forth in Sotheby's listing. The defendant's analysis of this claim, however, contains conclusory assertions and no authority to support his position that the seller's rate is the appropriate figure to employ. We conclude that the defendant has briefed this claim inadequately, and, accordingly, we decline to consider it.

Second, the defendant claims that the court should have, at most, awarded the plaintiff one half of the compensation it sought because he owns only a one-half interest in the property. This claim is summarized in four sentences with no legal authority cited. Because the defendant does not cite any authority or develop his claim with analysis, we conclude that the claim is inadequately briefed. *Commission on Human Rights & Opportunities ex rel. Arnold* v. *Forvil*, 302 Conn. 263, 279, 25 A.3d 632 (2011).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 20-325a (b) provides: "No person, licensed under the provisions of this chapter, shall commence or bring any action with respect to any acts done or services rendered after October 1, 1995, as set forth in subsection (a), unless the acts or services were rendered pursuant to a contract or authorization from the person for whom the acts were done or services rendered. To satisfy the requirements of this subsection any contract or authorization shall: (1) Be in writing, (2) contain the names and addresses of the real estate broker performing the services and the name of the person or persons for whom the acts were done or services rendered, (3) show the date on which such contract was entered into or such authorization given, (4) contain the conditions of such contract or authorization, (5) be signed by the real estate broker or the real estate broker's authorized agent, (6) if such contract or authorization pertains to any real property, include the following statement: 'THE REAL ESTATE BROKER MAY BE ENTITLED TO CERTAIN LIEN RIGHTS PURSUANT TO SECTION 20-325a OF THE CONNECTICUT GENERAL STATUTES', and (7) be signed by the person or persons for whom the acts were done or services rendered or by an agent authorized to act on behalf of such person or persons, pursuant to a written document executed in the manner provided for conveyances in section 47-5, except, if the acts to be done or services rendered involve a listing contract for the sale of land containing any building or structure occupied or intended to be occupied by no more than four families, the listing contract shall be signed by the owner of the real estate or by an agent authorized to act on behalf of such owner pursuant to a written document executed in the manner provided for conveyances in section 47-5."

[2] The court found for the defendant on the plaintiff's first count. This judgment has not been challenged on appeal.

[3] General Statutes § 20-325a (e) provides: "A licensed real estate broker who has performed acts or rendered services relating to real property upon terms provided for in a written contract or agreement between the broker and the owner or buyer for whom such acts were done or services rendered shall have a lien upon such real property. The lien shall be in the amount of the compensation agreed upon by the broker and the owner or buyer for whom such acts were performed or services rendered."

[4] "[T]he legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires us to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction." (Citation omitted, internal quotation marks omitted.) *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 310, 819 A.2d 260 (2003).

[5] General Statutes § 20-325c (b) provides: "Notwithstanding any provision of the general statutes to the contrary, no real estate broker or real estate

salesperson, and no person affiliated with such broker or salesperson, who receives a fee, commission or other valuable consideration for the sale of residential real property, may receive a fee, commission or other valuable consideration for negotiating, soliciting, arranging, placing or finding a first mortgage loan for the buyer in connection with the same sale unless disclosure is made in accordance with the provisions of subsection (c) of this section. Any fee, commission or other valuable consideration received by such broker or salesperson for negotiating, soliciting, arranging, placing or finding a first mortgage loan shall (1) be related to the services actually performed, as determined by the Banking Commissioner by regulations adopted pursuant to chapter 54, (2) not be imposed for the referral of the buyer to the mortgage lender by such broker or salesperson, and (3) be paid directly to the broker or salesperson by the buyer rather than from the mortgage loan proceeds at the time of closing."

———————————————————