[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] RULING ON APPLICATIONS FOR PREJUDGMENT ATTACHMENTS
The plaintiff, Wyatt Energy, Inc. ("Wyatt"), has filed an application to attach assets of defendant Motiva Enterprises, LLC ("Motiva") in aid of its claims in counts five, six and seven of the above-captioned case. Motiva has filed an application to attach Wyatt's assets in aid of Motiva's counterclaim.
Procedural history
The two applications for prejudgment attachments now before this court were filed in a related case, Motiva Enterprises v. Wyatt Energy, Inc., Docket No. X01 CV 02 0172116S. In that case, Motiva filed no civil complaint but sought a prejudgment attachment in aid of its intended arbitration of those claims. This court has ruled that the issues raised by Motiva in that case were indeed subject to a contractual agreement to arbitrate but that the arbitration must be enjoined because the matters raised were inextricably intertwined with nonarbitrable issues. See "Memorandum of Decision on Wyatt's Application to Enjoin Arbitration and Motiva's Motion to Stay Action Until Completion of Arbitration," Wyatt Energy, Inc. v. Motiva Enterprises, LLC, Superior Court, judicial district of Waterbury, Docket No. 02 0457090 (now 0174090) (September 27, 2002). Accordingly, the parties stipulated on the record that the applications should be adjudicated in the above-captioned case, in which Wyatt has also asserted claims that this court has ruled are not subject to the obligation to arbitrate.
Motiva seeks to attach Wyatt's assets in aid of its counterclaims. CT Page 15917
The court heard evidence concerning the two applications for prejudgment attachments of assets on October 16, and 17, 2002. The parties requested an opportunity to file post-hearing briefs, and the court granted that request. Wyatt attached several documents to its brief. Motiva objected that Wyatt was attempting to present evidence after the hearing had been concluded., and this court sustained the objections as to some of the attachments. Motiva then sought leave to open the evidence to introduce additional facts because of what it saw as a misleading statement in Wyatt's post-hearing brief. This court denied that motion. Briefing is now complete.
Availability of prejudgment attachment
The claims that Wyatt makes in the first four counts of its complaint are subject to an agreement to arbitrate disputes. See Wyatt Energy, Inc. v. Motiva Enterprises, LLC, supra, 02 0174090 (September 27, 2002). Connecticut General Statute § 52-422 provides that "[a]t any time before an award is rendered pursuant to an arbitration under this chapter, the superior court. . . upon application of any party to the arbitration, may make forthwith such order or decree, issue such process and direct such proceedings as may be necessary to protect the rights of the parties pending the rendering of the award and to secure the satisfaction thereof when rendered and confirmed." This statute authorizes adjudication of prejudgment attachments to secure assets to pay an amount that may ultimately be awarded in a party in an arbitration. Wyatt has informed this court, however, that it has no intention of proceeding with an arbitration of those claims that this court has held must be arbitrated. Section 52-422 does not authorize the court to permit attachment of assets in aid of arbitrable claims when the party seeking attachment has abandoned those claims by failing to pursue arbitration after a ruling that the claims are arbitrable. The purpose of a prejudgment attachment is to secure assets to pay the eventual arbitration award or judgment. Where no arbitration takes place as to claims that a party is required to arbitrate, there is no prospect of an award or judgment, and no basis for awarding a prejudgment attachment.
Wyatt's application thus applies only to the claims made in this action that this court has held are not subject to the duty to arbitrate: the antitrust claims in counts five and six, and the claim of violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a et seq., in count seven. Motiva has pleaded as a special defense to the antitrust claim that Wyatt lacks standing.
Motiva's application is brought pursuant to Conn. Gen. Stat. §52-278a et seq. in aid of the claims Motiva makes in its counterclaims, which are described below. Wyatt has not asserted that the counterclaims are subject to the duty to arbitrate, nor has Wyatt argued that Conn. Gen. Stat. §§ 52-278a et seq., which provide for prejudgment attachments of an opponent's assets, are inapplicable to these counterclaims. CT Page 15918
Wyatt's Application
In counts five and six of its complaint, Wyatt claims that it suffered damages because Motiva attempted to monopolize the market for loading and distributing gasoline products in the market served by terminals in New Haven. Conn. Gen. Stats. §§ 35-27 through 29. Wyatt alleged that Motiva secured an exclusive right to load gasoline into trucks at Wyatt's loading rack in New Haven by way of a ten-year contract entered into with Wyatt on May 1, 1997, and that three years later Motiva acquired the only other major gasoline loading terminal in New Haven and shifted most of its volume to that terminal. Wyatt claims that the exclusive contract and the acquisition of the other terminal together constituted an illegal monopolization in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-29, and that because of Motiva's illegal actions, Wyatt was justified in terminating its contract with Motiva and selling the terminal. Wyatt claims damages for Motiva's alleged violation of the state antitrust act.
In count seven, Wyatt alleges that the conduct set forth at paragraphs 1 through 44 of its complaint constitutes a violation of CUTPA. Those paragraphs include numerous claims; however, Wyatt explains in its brief that it seeks a prejudgment attachment on the basis of a CUTPA claim in which the conduct that is claimed to be the unfair trade practice is the same conduct that is also alleged to constitute a breach of contract and an antitrust violation.
Motiva's Application
In its counterclaims, Motiva asserts that Wyatt breached a written agreement concerning terminal services for loading gasoline at Wyatt's New Haven terminal by terminating the contract on June 23, 2000, without complying with the provisions in the agreement concerning notice and cause and by selling the terminal to Williams Energy ("Williams"), another distributor of petroleum products, without requiring Williams to take over Wyatt's contractual obligations to Motiva, including the exclusive use of the gasoline terminalling facility, as part of the sale. Motiva also claims that Wyatt converted equipment and inventory belonging to Motiva by conveying it to Williams in the sale of the terminal. Motiva alleges as a third count of its counterclaim that Wyatt was unjustly enriched by retaining the revenue sharing agreement with Motiva and equipment installed at Motiva's expense when it sold its terminal to Williams. (Defendants' Answer, Special Defenses and Counterclaims, October 21, 2002.)
In response to Motiva's claim of breach of contract, Wyatt contends CT Page 15919 that Motiva committed a prior material breach of the terminalling agreement by failing to pay Wyatt a share of profits from fuel additives. Wyatt further claims that its refusal to continue to perform under the agreement and its failure to assign the obligations of the agreement to the buyer of its terminal did not constitute breaches of contract because the contract was unenforceable at the time Wyatt declared it terminated. Wyatt claims the contract was unenforceable because Motiva had engaged in conduct that Wyatt asserts violated the Connecticut Antitrust Act and CUTPA, namely, acquiring New Haven's only other major terminalling facility while Motiva had an exclusive right to use Wyatt's terminalling facility for gasoline throughput.
Standard of review
The issue before the court in deciding an application for a prejudgment attachment of assets is whether a party has established probable cause as to any of its claims, and the amount of damages that it has established it is likely to recover. Nash v. Weed Duryea, 236 Conn. 746, 749
(1996); Calfee v. Usman, 224 Conn. 29, 37 (1992); New England Land Co. v. DeMarkey, 213 Conn. 612 (1990); Augeri v. C.F. Wooding Co.,173 Conn. 426, 429 (1977).
Connecticut General Statute § 52-278d authorizes a trial court to issue a prejudgment attachment upon a determination "whether or not there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff." As the Supreme Court stated in Calfee v. Usman, supra, 224 Conn. 36-37:
 The trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits. New England Land Co. v. DeMarkey, [supra], 213 Conn. 620-21. . . . The hearing in probable cause for the issuance of a prejudgment remedy is not contemplated to be a full scale trial on the merits of the plaintiffs claim. The plaintiff does not have to establish that he will prevail, only that there is probable cause to sustain the validity of the claim. . . . The court's role in such a hearing is to determine probable success by weighing the probabilities. Id., 620. Moreover, this weighing process applies to both legal and factual issues. Augeri v. C.F. Wooding Co., [supra], 173 Conn. 429 . CT Page 15920 . .; Babiarz v. Hartford Special, Inc., 2 Conn. App. 388, 393 . . . (1984); Bank of Boston Connecticut v. Schlesinger, 220 Conn. 152, 156 . . . (1991); see also Three S Development Co., v. Santore, 193 Conn. 174, 175-76 . . . (1984).
(Internal quotation marks omitted.) Although § 52-278d was amended in 1993, after the Supreme Court's decision in Calfee v. Usman, supra,224 Conn. 29, the standard of review under § 52-278d was not changed. See Nash v. Weed Duryea Co., supra, 236 Conn. 749 (1996); Bosco v. Arrowhead by the Lake, Inc., 53 Conn. App. 873, 874 (1999) (per curiam).
Merits of Wyatt's Application
Findings
On April 30, 1997, Wyatt and Shell Oil Products Company, acting for itself and as an agent for Shell Oil Company, entered into a written agreement that provided that Wyatt would provide up to 500,000 barrels of storage tank capacity for gasoline and 100,000 barrels of storage tank capacity for jet fuel for Shell at Wyatt's New Haven facility. The agreement also provided that Shell and Shell's customers would have exclusive use of Wyatt's gasoline loading facilities in New Haven for a period often years. The contract provided for a split between Wyatt and Shell of the terminalling fees that Shell charged to its customers for gasoline loaded at the Wyatt loading rack and related services known collectively as "throughput." The contract did not require Shell to guarantee any particular level of use of Wyatt's gasoline throughput facility, but it provided that Shell would pay Wyatt a minimum payment of $65,000 per month ($780,000 per year) for the duration of the contract. The contract further gave Shell a right of first refusal if Wyatt received a bona fide offer from a third party to purchase the facility, and it provided that if Wyatt sold to a third party, Wyatt would require the buyer to honor the terms and obligations to Shell. (Ex. 1, para. F, p. 3.)
The contract included several pages of "Additional Terms and Conditions," including a provision that stated that the agreement "constitutes the entire agreement of the parties regarding the matters contemplated herein or related thereto, and no representations or warranties shall be implied or provisions added hereto in the absence of a written agreement to such effect between the parties hereafter." (Ex. 1, p. 8, para. 20.) The contract provides that the law of Texas shall apply to construction of the terms and to determination of the rights and CT Page 15921 obligations of the parties. (Ex. 1, p. 8, para. 20.)
At the time of this agreement, Shell also used gasoline terminalling facilities in Bridgeport. The contract did not provide that Shell would use Wyatt as its only source of gasoline loading in the New Haven area.
Shell and Shell Oil Products Company assigned their rights in the terminalling agreement to Motiva.
In or around August 1999, Williams Energy, another distributor of petroleum products, indicated an interest in purchasing the Wyatt terminal. By a letter dated November 3, 1999, Williams made a preliminary proposal to buy the Wyatt facilities for about $31 million. (Ex. 6.) Wyatt then told Williams about its obligation to Shell/Motiva, and Williams withdrew its offer on December 8, 1999. (Ex. 7.) During the fall of 1999, Motiva discussed purchase of the Wyatt terminal and was met with Wyatt's demand for the $31 million price initially proposed by Williams. Motiva became aware during the same time period that it could instead acquire the terminalling facility owned by Northeast Terminals, known as "Cargill," for $13 million. In its discussion of the pros and cons of buying the Cargill terminal, Motiva considered the fact that it was required by its contract with Wyatt to continue to pay the minimum of $65,000 per month for the duration of the contract, which had about seven more years remaining.
Wyatt proposed that Motiva agree to alter the terminalling contract to eliminate the right of first refusal in order to allow the sale to Williams to proceed. (Ex. 208.) Wyatt did not include in its proposal to amend the contract any change in the term that gave Motiva exclusive right to use the gasoline loading facilities at the Wyatt terminal.
Motiva declined to amend the contract with Wyatt in the manner suggested in Ex. 208 and went ahead with the purchase of the Cargill terminal in the spring of 2000. After acquiring the Cargill terminal, Motiva moved much of its gasoline-loading functions to the new terminal, taking the position that its only obligation to Wyatt with regard to the volume at the Wyatt facilty was the amount specified as the monthly minimum. No evidence was presented that Motiva raised its charges to customers after acquiring the Cargill terminal.
Wyatt sold its facility to Williams in the summer of 2000 without requiring Williams to assume the obligations of Wyatt's terminalling agreement with Motiva.
Wyatt's antitrust and CUTPA claims are based on the theory that by CT Page 15922 holding Wyatt to a contract that precluded it from providing distribution services to other gasoline distributors for the term of the terminalling agreement and by acquiring the only other major terminal from which other distributors loaded gasoline for distribution in the geographical area served by truck from New Haven, Motiva created a situation in which it could eventually raise the prices it charged those who used its gasoline storage and truck-loading services.
Motiva responds that even if the exclusive-use contract with Wyatt and the acquisition of the Cargill terminal had an anti-competitive effect on gasoline distribution in the region served by trucks loaded in New Haven, Wyatt cannot establish probable cause that it will prevail upon its claim for damages for violation of the Connecticut Antitrust Act because Wyatt lacks standing to assert that claim and because it has not asserted an "antitrust injury" to itself.
Connecticut Antitrust Act
Connecticut General Statute § 35-35 provides for recovery of treble damages and counsel fees by "[t]he state or any person, including, but not limited to, a consumer, injured in its business or property by any violation of the provisions of this chapter." Connecticut General Statute § 35-44b provides that in construing Connecticut's Antitrust Act, this state's courts "shall be guided by interpretations by the federal courts to federal antitrust statutes." The Connecticut Supreme Court has explained that this provision means that "we follow federal precedent when we interpret the act unless the text of our antitrust statutes, or other pertinent state law, requires us to interpret it differently." Westport Taxi Service, Inc. v. Westport Transit District, 235 Conn. 1,15-16 (1995).
Has Wyatt alleged an "antitrust injury?"
Wyatt asserts that Motiva lacks standing to raise an antitrust claim concerning the conduct alleged. Standing to assert an antitrust claim requires a showing that the plaintiff has been "injured in his business or property by reason of anything forbidden in the antitrust laws,"15 U.S.C. § 15. The Supreme Court has ruled that the injury must be more than an injury-in-fact: it must be "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.429 U.S. 477, 489 (1977). The federal courts have ruled that in determining whether a particular plaintiff has standing to seek damages under the antitrust statutes, courts must look to 1) whether the plaintiff has alleged an "antitrust injury," that is, whether the injury CT Page 15923 is one that the antitrust laws were intended to forestall; 2) the directness of the injury; 3) the existence of more direct victims; 4) the risk of duplicative relief; and 4) the complexity of the task of apportioning damages. Associated General Contractors of California v. California State Council of Carpenters, 459 U.S. 519 (1983); National Association of Pharmaceutical Manufacturers v. Ayerst Laboratories,850 F.2d 904 (2d Cir. 1988); In re Air Passenger Computer Reservation Systems, 727 F. Sup. 564 (C.D. Cal. 1989). The requirement that a plantiff allege an "antitrust injury" applies whether the plaintiff claims damages or only injunctive relief. Cargill v. Monfort, of Colorado., Inc., 479 U.S. 104 (1986). Even a plaintiff who has alleged that a defendant has engaged in conduct that is a per se violation of the antitrust statutes may lack standing if he or she does not allege injury that constitutes an antitrust injury. Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990).
The United States Supreme Court has also ruled that entities that suffer an indirect injury because of anti-competitive behavior do not have standing where there are potential plaintiffs who have suffered a direct injury from the practices at issue. Associated General Contractors of California v. California State Council of Carpenters, supra, 459 U.S. 515; Illinois Brick Co. v. Illinois, 431 U.S. 720, rehearing denied, 434 U.S. 881 (1977). In Illinois Brick, the State of Illinois alleged that it was a consumer of concrete blocks in its building projects, and that the defendant manufacturer had illegally conspired in pricing blocks sold to masonry contractors, who in turn sold the products as part of the work they performed for general contractors, who passed the increased cost along to Illinois as an end user. Since injury to the end user depended on whether the intermediate buyers had passed the cost along, the Court ruled that only those who purchased directly from the alleged price-fixer had standing to assert a claim.
The Court adopted this approach to standing with two policy goals in mind: 1) avoiding the risk of multiple liability to defendants and 2) avoiding the difficulties of proving the amount of the impact of the pricing violation actually passed along to the ultimate consumer.
As the above discussion demonstrates, the requirement that a plaintiff seeking money damages under the antitrust act must establish that it has suffered an "antitrust injury" is discussed in some caselaw as an element of standing. The ruling of the United States Supreme Court in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc, supra, 429 U.S. 477, however, establishes that the requirement of "antitrust injury" is also an element of the claim for statutory damages under the antitrust act. In that case, a bowling center sued for damages it allegedly sustained because a CT Page 15924 large bowling equipment manufacturer acquired and began operating bowling alleys in the plaintiffs market area, keeping the formerly failing competitors in operation by virtue of its deep pocket and ability to absorb losses. The Supreme Court found that while the defendants may have had a monopolistic aim in making the acquisitions, the plaintiff was suffering only the effects of competition and had not suffered an injury of the sort that the antitrust act was designed to prevent, but only the same loss that would have occurred if the failing competitors had been acquired by different interests or had managed to refinance, though the plaintiff had experienced a decrease in its anticipated market share because the acquired bowling alleys did not fail but stayed in business. The Court reasoned that a loss of market share resulting from the acquisition did not constitute an antitrust injury of the sort for which damages were available under the antitrust act and concluded that the plaintiff had not established one of the elements necessary for a recovery under the antitrust act.
Like the plaintiff in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., supra, 429 U.S. 477, Wyatt identifies an injury to itself that is really only a complaint that its market share has been diminished below its expectations. In its contract, Wyatt agreed to give Motiva the exclusive right to use its loading facilities for gasoline loading for ten years in return for a guaranteed minimum revenue. By virtue of that contract, Wyatt obligated itself not to sell its services to other distributors for the term of the contract, and it therefore put itself in the position of being assured only of the minimum payment, since the contract contained no clause requiring Motiva to use its services exclusively. Wyatt secured the advantage of Motiva's business for ten years, with a guaranteed minimum revenue, but it did not, as part of that bargain, obtain any promise from Motiva to use Wyatt's facilities exclusively and not to obtain terminalling services from others during the term of the contract. Wyatt had to compete with the Cargill terminalling operation both before and after its acquisition by Motiva. Since Motiva had no contractual obligation to maximize its use of Wyatt's facility, Motiva could have contracted for services at the Cargill facility instead of purchasing it, such that Wyatt would have received only the minimum volume payment it had secured in its contract with Motiva. The same effect occurred when Motiva acquired the Cargill terminal and shifted its customers, except for those necessary to achieve the minimum payment volume, to that facility. The loss of volume over the guaranteed minimum from Motiva was a loss to Wyatt, but it was not a loss that was an "antitrust injury" because the antitrust act does not have the purpose of maintaining a particular market share for existing competitors. When Motiva used terminalling services of its own in addition to those that it was contractually obligated to obtain from Wyatt, Wyatt continued to be CT Page 15925 entitled to the same benefit it had enjoyed before that event, namely, the minimum volume payment provided for in the contract, and it was injured in its expectations of greater volume not because of conduct that the antitrust act was designed to prevent, but because of a change to another facility that Motiva was contractually free to engage in without regard to the ownership of the other facility.
As an alternative theory, Wyatt argues that Motiva's acquisition of the Cargill terminal while it had an exclusive contract to use Wyatt's facilities was likely to cause antitrust injuries to others. Wyatt seeks to assert a claim of injury not to itself but to other entities, including distributors who must find gasoline-loading services for the area served by trucking gasoline from terminals in New Haven. Under the precedents cited above, Wyatt lacks standing to assert an antitrust claim for injuries to others. The court notes that Wyatt is not a vigorous advocate for the distributors for whose welfare it claims to be concerned. Though its brief might suggest otherwise, Wyatt did not seek a release from the feature that was likely to cause problems for other distributors, namely, its agreement to allow only Motiva to use its gasoline terminalling facilities. Instead, the only proposal it made concerning the contract was for Motiva to give up its right of first refusal in the event of a sale of the Wyatt facility. (Ex. 208.)
CUTPA Claim
Wyatt claims that the same conduct that it alleges constituted a breach of contract and a violation of the Connecticut Antitrust Act also violates the CUTPA, which prohibits use of unfair or deceptive trade practices.
The standard for determining whether an act or practice constitutes a CUTPA violation is the test, known as the "cigarette rule," recognized by the Federal Trade Commission in enforcing the federal statute on which CUTPA is modeled:
 (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers[, competitors or other businessmen]. CT Page 15926
Jacobs v. Healey Ford-Subaru, Inc., 231 Conn. 707, 725 (1995); A-G Foods, Inc. v. Pepperidge Farms, Inc., 216 Conn. 200, 215 (1990).
Wyatt's breach of contract claim is, essentially, that in assuming Shell's obligations under the terminalling agreement, Motiva obligated itself to maximize the amount of gasoline put through the Wyatt terminal, and that it acted unscrupulously in obtaining another source of the same services while it was under an obligation to use only Wyatt's facility. At the time it negotiated the terms of the terminalling agreement, Wyatt apparently failed to foresee that the Cargill terminal might be put up for sale, creating an opportunity for Motiva to obtain services from a source other than Wyatt.
This court does not find that Wyatt has established probable cause that it will prevail on a CUTPA claim in which the alleged immoral, unfair or unscrupulous conduct in trade or commerce is the failure to maximize use of Wyatt's facility. The terms of the agreement contain no requirement that Motiva use Wyatt's terminal exclusively, nor that it maximize its use. While Wyatt declares that such obligations were understood, the plain language of the contract, at Section 20 of the Additonal Terms and Conditions, negates any understanding not expressly contained in its text. (Ex. 1, Section 20.) Wyatt is unlikely to prevail on a claim that conduct that was not even a breach of contract constituted an unfair trade practice.
Wyatt likewise has failed to establish probable cause that it will prevail on a CUTPA claim in which the underlying unfair practice is the alleged violation of the Connecticut Antitrust Act. Since this court has found that Wyatt has not demonstrated probable cause that it will prevail on its antitrust claim, the issue is whether the conduct that is claimed to constitute a violation of the Connecticut Antitrust Act may support a CUTPA claim even if the plaintiff cannot prevail on a free-standing claim of violation of the antitrust act itself.
The Connecticut Supreme Court's approach to statutory bases for CUTPA violations in Lees v. Middlesex Insurance Co., 229 Conn. 842, 850
(1994), provides some guidance. In that case, the plaintiff alleged that the defendant had violated CUTPA because it had violated the public policy stated in the provisions of the Connecticut Unfair Insurance Practice Act ("CUIPA"), Conn. Gen. Stats. § § 38-60 et seq. Citing Mead v. Burns, 199 Conn. 651 (1986), the Court ruled that a plaintiff who could not prove a general business practice, which is an element of CUIPA, did not state a cause of action under CUTPA for conduct for which the provisions of CUIPA supplied the statutory basis for CT Page 15927 unfairness. In other words, a plaintiff unable to prove the elements of a CUIPA claim could not prevail in a CUTPA claim in which CUIPA's provisions set the standard for unfairness. The reason for this outcome is plain. Were the courts to hold otherwise, a plaintiff could impose liability for statutory violations via CUTPA even though that party was unable to prove all the essential elements of the statute invoked, with the practical effect of removing the requirements of such statutes.
Since this court finds that Wyatt lacks standing to assert an antitrust claim concerning the effect on other distributors and since the injury it has alleged to itself is not an "antitrust injury" it has not demonstrated probable cause that it can prevail on a CUTPA claim based on the same alleged violation. Like the plaintiff in Lees, supra,229 Conn. 842, Wyatt's statutory claim lacks an element of a cause of action under the statute claimed as the source of the standard for unfairness under CUTPA, and Wyatt lacks probable cause that it can recover under CUTPA on this claim.
Merits of Motiva's Application
The claim on which Motiva's application is based and Wyatt's pleadings to that claim are set forth above. The terminalling agreement provides that claims concerning the contract are to be decided under Texas law. Texas courts require that a party seeking to recover for a breach of contract prove the existence of a valid contract between the parties, a breach of a material duty under the contract and that the claimant sustained damages from the breach. Cadle Co. v. Castle, 913 S.W.2d 627,631 (Tex.App. 1995).
Wyatt asserts that it was justified in terminating the contract because Motiva's acquisition of the Cargill terminal constituted a prior material breach that excused its further performance under the contract. Wyatt is unlikely to prevail on this defense because the terminalling contract did not prohibit Motiva from obtaining terminalling services elsewhere. In its inital pleadings, Wyatt did not identify as a prior breach Motiva's failure to pay it a share of profits from additives, but it added this claim in the course of the hearing, when it purported to discover for the first time that it had not been receiving such payments. The contract provides for a split of throughput fees from Motiva's customers and defines "throughput" as "the total revenue generated from a Customer including any dock use fee, rack access fee, additive injection verification and record keeping fees (excluding additive product costs) . . ." (Ex. 1, p. 2.) The definition does not include fees for supplying additives, and the specific exclusion from this definition of the cost of additives to customers buttresses the conclusion that such charges were CT Page 15928 not included in the revenue to be divided between Wyatt and Motiva. Under the contract, it appears that Wyatt was entitled to a share only of the administrative costs charged for additives, not a percentage of the revenues from sale of additives. Failure to split profits from sales of additives cannot be a material breach that justified termination when the contract excluded this item from the definition of the revenues to be split. Wyatt's chief executive, moreover, conceded that Wyatt would not have regarded failure to pay a portion of the additive charges as a ground for terminating the entire contract, nor would this court consider such an omission a material breach that excused Wyatt from performing its obligations under the contract.
Wyatt further asserts that it was justified in terminating the contract because failing to do so would constituted a violation of the Connecticut Antitrust Act. Wyatt presented no evidence that any governmental authority had accused it of an antitrust violation by virtue of its contract with Motiva, and the evidence suggests that this alleged concern was not the real reason for the termination. Some of Wyatt's shareholders were so anxious to sell and found the Williams offer so attractive that they reallocated more proceeds to other shareholders in return for the control that allowed them to pursue the sale.
The court is unpersuaded by Wyatt's invocation of a clause in the contract concerning compliance with applicable law. The actual language of the contract is that "Wyatt and Shell hereby agree to comply fully in the performance of the Agreement with all federal, state, and local government law, regulations, and rules as well as all operational rules, instructions and standards from Shell as listed in Exhibit A . . ." (Emphasis supplied.) (Ex. 1, Additional Terms and Conditions, p. 2.) The "performance of the agreement" logically refers to the services Wyatt was to supply, that is, storage of gasoline and other fuels and loading of gasoline, and the compensation Shell, and later Motiva, was to supply, not to other business dealings of the parties not specified as duties to be performed under the contract. The contract contained no provisions by which Motiva obligated itself in any way with respect to its obtaining of other facilities, and this conduct is not within the meaning of "performance of the agreement."
Under the principles that apply to a claim of breach of contract under Texas law, Motiva has demonstrated probable cause on its claim that Wyatt breached its obligations under the terminalling agreement by terminating it on June 23, 2000 (Ex. 213), and by selling to Williams without requiring Williams to assume the obligation to continue with Motiva as its exclusive customer for gasoline terminalling and the other features of the terminalling agreement. Motiva had moved its customers to the CT Page 15929 Cargill terminal, and the only customer whose business it convincingly demonstrated that it lost because of the breach was Citgo, which continued to use the Wyatt-Williams facility. Motiva claims that it lost $558,465 per year from Citgo volume in the two years that have already passed since Wyatt terminated the contract. This figure includes fees for additives, which the court finds were probably to be wholly retained by Motiva, with no split to Wyatt under the terms of the agreement. Wyatt argues that Motiva has not lost $558,465 per year because it was obligated to pay Wyatt a minimum payment of $780,000 and would have experienced a loss only after paying that amount. As the calculations at column M of Ex. 2 indicate, however, Citgo's total fees paid were in an amount that would have exceeded the required minimum due to Wyatt, and Motiva has demonstrated that it would probably have earned $558,465 from Citgo in the first year following the date of termination even after paying Wyatt its annual minimum.
The court does not find, however, that Motiva has established probable cause that it will experience losses from the Citgo account for all the years remaining on Motiva's terminalling agreement with Wyatt.
Citgo's customer agreement with Shell, which is the basis of Motiva's claim for a portion of the terminalling fees charged to Citgo at the Wyatt terminal, had a term of five years, commencing on August 1, 1997. (Ex. 3.) Citgo had no obligation to be Motiva's customer after August 1, 2002, and Motiva's assumption that Citgo would have continued as its customer after that date is speculative. The court finds that Motiva has demonstrated probable cause that it will recover $1,116,930 on this claim. That sum represents Motiva's likely revenue from the two years remaining on the Citgo-Motiva contract.
Motiva has not established probable cause with regard to its claim of loss of the value of equipment it had installed at the Wyatt terminal, and the need to install jet fuel filters at Cargill. The terminalling agreement contains no provision concerning return of equipment, and Motiva presented no credible evidence of the present value of the equipment. The terminalling agreement provides, at Section 21B of the Additional Terms and Conditions, that neither party may recover consequential damages.
In addition to its claims for damages for breach of contract, Motiva claims that Wyatt converted the additive equipment and other capital improvements by including it in the assets it sold to Williams. To establish a claim for conversion, a party must demonstrate ownership of the asset at issue, that the other party deprived it of the asset for an indefinite period of time, that the deprivation was not authorized, and CT Page 15930 that loss resulted from it. Aetna Life Casualty Co. v. Union Trust Co., 230 Conn. 779, 790-91 (1994); Discover Leasing, Inc. v. Murphy,33 Conn. App. 303, 309 (1993). Motiva claimed that its damages were the loss of the value of the equipment; however, it failed to produce competent evidence from which this court could find the probable value of the equipment at the time of breach. Motiva's sole witness on this issue, Daniel Grinstead, admitted that his estimate of present value was not the product of his own analysis and expertise but was the product of estimates by others. He was not able to explain how the values had been arrived at.
Motiva did, however, establish that Wyatt retained additives with a value of $40,000, and the court finds that Motiva has established probable cause that it will recover damages for the conversion of this asset.
Conclusion
For the foregoing reasons, the court denies Wyatt's application for a prejudgment attachment of Motiva's assets and grants Motiva's application to the extent of authorizing it to attach Wyatt's assets in the amount of $1,156,930.
 ___________________ Beverly J. Hodgson Date Judge of the Superior Court
CT Page 15931